# NATIONAL LABOR RELATIONS BOARD v. UNION PACIFIC STAGES, Inc.*

## No. 8489.

Circuit Court of Appeals, Ninth Circuit.

Sept. 23, 1938.

*Rehearing denied Jan. 9, 1939.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Jerome I. Macht, and Aaron W. Warner, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

Arthur C. Spencer, Jr., and Roy F. Shields, both of Portland, Or., for respondent.

Before GARRECHT, MATHEWS, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

This case arises upon petition by the National Labor Relations Board for the enforcement of an order issued by the Board pursuant to Section 10 of the National Labor Relations Act. 49 Stat. 449, 453, 29 U.S.C.A. §§ 151 et seq., 160.

On April 3, 1936, a labor organization known as Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, Local Division 1055 [hereinafter called the Union], filed a charge against the Union Pacific Stages, Inc. [hereinafter called respondent]. A fomal complaint and notice of hearing was issued by the Board against the respondent on June 12, 1936. The complaint in brief alleges that respondent, a corporation organized under the laws of Oregon, was engaged in the operation of motor busses for the transportation of passengers and express for hire between points within the States of Idaho, Utah, Washington, Oregon, and various other states of the United States; that respondent had engaged in and was engaging in certain unfair labor practices affecting commerce within the meaning of Section 8, subdivisions (1) and (3) and Section 2, subdivisions (6) and (7) of the National Labor Relations Act, 29 U.S.C.A. §§ 152 (6, 7), 158 (1, 3) by discharging and refusing to reinstate Hebe Dobbs, Carroll B. Kiesel, F. H. Woodford,

Harold G. Allen and John H. Gish, employees, because of their membership and activity in the Union; by the respondent's interfering with the administration of the Union in preventing its officers from procuring the free, voluntary, and unbiased expression of the Union from its members in regard to labor policies, and by various other acts interfering with union activities of its employees thereby having engaged in unfair labor practices "affecting commerce" as defined in the Act. Section 2(7), 29 U.S.C.A. § 152(7).

The respondent filed an answer to the complaint, alleging that the Act, as attempted to be applied in the complaint, is unconstitutional and void. The answer substantially admitted the allegations of the complaint relating to the nature of its business and the duties of the employees involved; also admitted that the respondent had discharged and refused reinstatement to the employees named in the complaint, but alleged that their employment was terminated for good cause and not for the reason asserted in the complaint. The answer further denied that respondent had made statements tending to discourage membership in the Union, and averred that any statements so made by any of its agents or employees were expressions of individual, unauthorized opinions. Respondent also denied that it had interfered with the administration of the Union, and moved that the complaint be dismissed.

Hearings were held before the Trial Examiner duly designated by the Board. Upon motion of counsel for the Board an allegation in regard to the discharge of John H. Gish, one of the employees, was stricken from the complaint. At the hearing, an allegation that respondent had committed acts in violation of Section 8, subdivision (2) of the Act, 29 U.S.C.A. § 158(2), was added by amendment to the Board's complaint, and designated as paragraph 9A.

On September 11, 1936, the Trial Examiner filed an intermediate report finding in substance that the respondent and the employees involved herein are engaged in interstate commerce; that as to Harold G. Allen, one of the employees named in the amended complaint, the allegations of the complaint are not sustained, and insofar as the complaint charged respondent with violation of Section 8, subdivision (2) of the Act, the evidence does not sustain the charge; that in respect to other allegations, respondent had violated the Act in the manner alleged. He recommended that the respondent cease and desist from interfering with the Union activities of its employees and that it offer to immediately reinstate Hebe Dobbs, C. B. Kiesel and F. H. Woodford, and make them whole for losses suffered by reason of their discharge.

Exceptions to the intermediate report were taken both by the Union and the respondent corporation. Hearing was held before the Board which thereafter issued its decision containing its findings of fact and order, in the main confirming the findings and conclusions of the Trial Examiner and ordering his recommendation carried out, except that the Board dismissed the complaint insofar as it related to F. H. Woodford.

Petition for the enforcement of its order has now been made by the National Labor Relations Board.

With respect to the nature of respondent's business and the duties of these employees it was agreed and the Board found that the respondent is engaged in traffic, commerce and transportation among the several States and that the drivers and operators are directly engaged therein. It further found that Hebe Dobbs and Carroll B. Kiesel had been discharged because of their activity in the Union, and that respondent has engaged and is engaging in unfair labor practices. The evidence upon which these findings were based will be discussed hereafter.

In insisting that the action of the Board must be sustained that portion of the Act which provides that "the findings of the Board as to the facts, if supported by evidence, shall be conclusive", section 10(e), 29 U.S.C.A. § 160(e), is emphasized. We must and do comply with this requirement even where in doing so we sometimes enforce findings of the Board which we would not do if permitted to exercise our independent judgment.

The serious question here involved relates to the discharge of certain of respondent's drivers. Originally five were named in the complaint as having been improperly discharged, but as to three of these, the complaint was dismissed prior to the submission of this petition. The important issue now is, whether drivers Dobbs and Kiesel were discharged for union activities, or because of their violation of well-known company regulations.

In arriving at the conclusion that these drivers were discharged contrary to the Act the Board relies to a large extent upon what it terms background. In developing this perspective the ordinary judicial approach to the consideration of evidence is abandoned and a novel method invoked by which statements made by dissatisfied employees upon their examination in chief are quoted to support some of the findings of the Board, although, in specific instances, this evidence was modified or eliminated by admissions made on cross-examination. On the other hand, testimony of Company officials which disputed the charges, even where apparently corroborated, was invariably disregarded wherever there was a conflict in the evidence. True, there may have been something in the demeanor or appearance of these witnesses for respondent which may have influenced the report of the Examiner and accounted for this remarkable discrimination, but no apparent reason is manifest from the record itself.

That this "background" upon which the Board so strongly relies to support its order to reinstate the discharged employees presents a somewhat distorted picture of the activities of respondent, a limited scrutiny of the findings will serve to reveal.

Prior to the organization of any union the respondent had discharged a large number of employees. It explained that its policy in this regard was governed by the need of increasing the quality of its service. Testimony shows that in 1934, at a meeting of local superintendents with General Superintendent Manning, one of the principal subjects he called to their attention was the number of accidents that had been occurring in the preceding month. Just at that time a telegram was received advising that a locally hired driver, in attempting to pass a car on the brow of a hill, had met another car coming in the opposite direction, injuring the occupants. It was pointed out that this was an entirely avoidable accident and violated all Company rules and state laws and Manning said that it would be impossible to continue in business and still pay claims on these accidents and that it was necessary that the local superintendents do something with these men or they could not continue with the Company. Furthermore, it is in evidence and uncontradicted that respondent has been very exacting in having competent drivers handle its stages and passengers and takes pride in having maintained a very successful operating record.

Following this conference there were a number of drivers discharged. Some of these began actively to take part in the organization of a union.

In September, 1934, Mr. Van Avery, an employee of respondent who later became president of the Union, advised the management that the employees were considering organizing a union. R. J. Walsh the respondent's president, stated that "if the boys wanted a union they could have it." He and General Superintendent Manning stayed out of the territory while organization activities were going on. The organization of the Union proceeded openly and a charter was issued to it November 23, 1934, and it was fully perfected about December 21, 1934, upon which date the request for a conference was made by the Union.

Before consenting to hold a conference, Walsh insisted that proof of the Union's right to represent the employees be submitted. Because there was confusion as to whether the Railway Labor Act or the National Industrial Recovery Act governed the attempts of the respective parties to bargain, there was some uncertainty as to which Board had jurisdiction to supervise the selection of a bargaining agency. Mr. Walsh signified his willingness to proceed under either Board. It was finally agreed to hold the election under the auspices of the old National Labor Board.

The election was held during the week of January 28 to February 4, 1935, to determine the matter. The vote showed the selection of the Union as bargaining agency, which fact was certified by the Board on February 7, 1935. On the next day the Union suggested February 18, 1935, as the date for the conference, to which respondent assented. It was held on that date and continued from day to day until February 23, 1935, when the agreement was reached, which was to remain in effect for one year.

In support of its findings the Board argues that the insistence of respondent's president, Walsh, that the Union prove its right to represent the employees and that three days were taken up in arriving at an agreement which was to govern the activities and relations of the respective parties for a year occasioned unreasonable delay. It is indicated that these incidents constitute unfair labor practices.

It is conceded that Walsh said, "If the boys wanted a union they could have

it," but it is adversely commented upon that when it came to bargaining, he wanted to know that those who claimed to represent the Union had authority. That this precaution was wise, the difficulties that have arisen over this very question in many labor disputes fully attest. Furthermore, the Supreme Court has held not only that the company is required to treat with the representative chosen by the employees but is also required to refrain from entering into collective labor agreements with anyone other than the true representative as ascertained in accordance with the provisions of the law.

Included in the Railway Labor Act there is a provision relative to collective bargaining similar in scope and purpose to the one in the National Labor Relations Act. In construing this provision the Supreme Court in Virginian R. Co. v. System Federation, 300 U.S. 515, said at page 548, 57 S.Ct. 592, at page 600, 81 L. Ed. 789, decided March 29, 1937: "The obligation imposed on the employer by section 2, Ninth (45 U.S.C.A. § 152, subd. 9), to treat with the true representative of the employees as designated by the Mediation Board, when read in the light of the declared purposes of the act, and of the provisions of section 2, Third and Fourth (45 U.S.C.A. § 152, subds. 3, 4), giving to the employees the right to organize and bargain collectively through the representative of their own selection, is exclusive. It imposes the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other."

In the case of National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, at page 44, 57 S.Ct. 615, at page 627, 81 L.Ed. 893, 108 A.L.R. 1352, this holding was noticed and applied to the Act here under consideration as follows: "The provision of section 9(a) [29 U.S.C.A. § 159(a)] that representatives, for the purpose of collective bargaining, of the majority of the employees in an appropriate unit shall be the exclusive representatives of all the employees in that unit, imposes upon the respondent only the duty of conferring and negotiating with the authorized representatives of its employees for the purpose of settling a labor dispute. This provision has its analogue in section 2, Ninth, of the Railway Labor Act, as amended (45 U.S.C.A. § 152, subd. 9), which was under consideration in

Virginian Railway Co. v. System Federation, No. 40, supra. The decree which we affirmed in that case required the railway company to treat with the representative chosen by the employees and also to refrain from entering into collective labor agreements with anyone other than their true representative as ascertained in accordance with the provisions of the act. We said that the obligation to treat with the true representative was exclusive *and hence imposed the negative duty to treat with no other.*" (Italics supplied.)

By reason of this delay some bitterness was injected into the situation before negotiations had begun. After a little acrimonious correspondence the day of meeting for conference was agreed upon and the representatives of the parties came together.

Many of those conducting the negotiations had little or no experience in collective bargaining. The representatives of the Union had brought with them to the meeting a prepared agreement which they wanted the officials of respondent to sign forthwith; this they declined to do. After discussion and bargaining and little progress, lawyers for the respective parties were brought in. After three or four days an agreement was arrived at, reduced to writing and executed. Considering the circumstances and the importance of the matter it can hardly be said that there was undue delay. In any event, the respondent was not required to proceed with haste, indeed was not required to enter into any agreement if it did not choose to do so. To quote again from National Labor Relations Board v. Jones & Laughlin Steel Corp., supra, at page 45, 57 S.Ct. at page 628, "The act does not compel agreements between employers and employees. It does not compel any agreement whatever. It dos not prevent the employer 'from refusing to make a collective contract and hiring individuals on whatever terms' the employer 'may by unilateral action determine.' "

There are many instances of such artificial background which reflect respondent's activities in a false light.

Referring to those who took part in formulating the agreement as representatives of the Union the Board in its finding makes this statement: "The negotiations were conducted on behalf of the Union by William Cooper, 13th International Vice President, Hebe Dobbs, rep-

resenting the employees of the Boise division, W. J. Ewing, representing the employees of the Salt Lake City division, Charles Goodman, representing the employees of the 'Spokane division, and Van Avery."

'And in a foot note emphasizes: "Dobbs, Ewing and Goodman have since been discharged by the respondent. Cooper was not an employee. Van Avery is still in the respondent's employ."

From the above, the inference is plain that the respondent had punished its employees who had taken part in this conference by discharging all of them except Van Avery.

The rules of respondent Company forbid stage drivers to drink on or off duty As to Ewing, the record indicates that he had violated the rule against drinking, then came into the office of the respondent at Salt Lake City and voluntarily quit, stating he had had a good time, that it was worth it, and "we will call it a day." The President of the Union admitted that it did not ask the management for a hearing in his case.

. As to representative Goodman, Van Avery 'testified on direct examination that he was discharged, which seems to have been accepted without question by the Board. On cross-examination, however, Van Avery admitted that Goodman had to leave the service because of the loss of an eye in an accident at his home, which was confirmed by the testimony of respondent's general superintendent. The facts, correctly presented, change the background of the picture.

A total of 18 of respondent's employees have acted as officers or committeemen of the Union during its existence. Of that number one·left the service on account of physical·disability, three quit voluntarily, and up to the time of hearing twelve were still in the Company's employment, and only Dobbs and Kiesel, members of the Union, were discharged and during the same time two non-union drivers were discharged although the number of Union employees was several times larger than the total number of non-union employees.

■ Another statement in the findings of the Board is as follows: "About the time of the formation of the Union, the respondent ceased hiring drivers in the localities where they were needed, and began instead to recruit all of its new drivers in Omaha. The respondent has explained this change of policy on the ground that Omaha provided convenient and superior training facilities. The Union, however, contends that the respondent's aim was solely that of undermining the organization of its employees. Van Avery testified that nine drivers and three shop men were sent to the Portland division from Omaha to take the places of discharged employees, whereas no local men had been employed. The consequence of this was a lowering of the number of Union members in Portland from 24 (which included all the drivers in the division) to 15. Van Avery testified further that new drivers were invariably hostile to the Union."

Here again there seems to be a studied evasion of a definite finding but the idea intended to be conveyed is that the practice was purposely initiated to undermine the Union. The testimony for the Union is summarized most favorably while respondent's explanation is dismissed with a sentence. In this regard the record shows that the respondent at various times commencing in 1931 acquired different bus lines which eventually were consolidated under one management with headquarters at Omaha. Because the hiring of drivers at different points had resulted in the company acquiring many inferior drivers who had been weeded out by other companies the policy was adopted of hiring all drivers through the Omaha office, which permitted a better check on drivers, and where the Company had a school for breaking in new drivers. This policy was inaugurated in 1931, long before the Union was organized.

The Company officials did not transfer those that came to the West on their own initiative, but it was done at the request of the employees themselves. Some asked to be transferred because the superintendent under whom they had been working was sent to the West and they desired to continue to work under him; some preferred the Northwest climate; some came because of relatives; some because the extra boards were not so crowded in the West and they would have better opportunities.

It appears from the evidence that a similar situation existed with reference to drivers wishing to be transferred to Los Angeles, a point where, it is interesting to note, no union has been organized. Further, a number of those who transferred from Omaha to the West joined the Union

after they came, which hardly sustains the finding that the drivers were sent out to disrupt the Union.

As to the statement included in the above quoted paragraph, that besides these drivers "three shop men were sent to the Portland division from Omaha to take the place of discharged employees," this finding also is intended to create the same impression, that Union men were discharged and non-union men sent in to take their places in order to break up the organization.

Concerning these shop men, the uncontradicted testimony of Manning shows that John Nelson was foreman for respondent at Los Angeles, and had been transferred from there to Omaha as foreman. Later, changes of equipment and type of coaches were made in the Northwest which were similar to those operated between Los Angeles and Salt Lake, and Nelson, who had been in charge of this same type of equipment and had operated it successfully for the respondent, was sent to Portland to take care of it. He was later made foreman but the man who had been foreman was not discharged but continued as mechanic without any reduction in wages. Another of these shop men was Ralph Norgard, who had been a machinist at Omaha and had taken care of the regular machine work on the motors, all reline boring, work on the connecting rods, and that sort of repairs. Through his fine work respondent was able to rehabilitate cars, and salvage many of the parts. A new position was created for him at Portland where he was sent to take charge of this class of work. He did not replace anyone. The third man was Paul Kear. He came to Manning personally in Omaha. He wanted work in Oregon where his relatives lived. He had lived in Portland before. About that time respondent put on some additional men at Portland and Kear was one of these. He did not replace anyone when he came out and he did not come to fill a vacancy.

Another finding of the Board which had an important influence upon their action was stated as follows: "This attempt on the part of the respondent to undermine the strength of the Union becomes increasingly manifest because of the conduct of Walsh and Manning during this period. In November, 1935, Walsh made a tour of the respondent's divisions, and, in a series of meetings, informed the employees that he had taken steps toward securing an increase in pay, but that this was a matter with which the Union had nothing to do. He also stated that the employees had no need of a union in order to safeguard their rights, and that they were not obliged to 'pay tribute.'"

To support these findings in relation to the question of wages the Board relies upon the testimony of Van Avery as taken from his direct examination to which we are cited in petitioner's brief. His testimony in chief was that Mr. Kuse was sent to Portland as respondent's superintendent about September 1, 1934; that just prior to that time the drivers had begun to talk about an increase in wages and the organization of a union. When Kuse arrived he called the men in to get their slant on the situation. Van Avery was one of those who talked with Kuse concerning the increase of wages. The following is his testimony regarding that conversation:

"In about two weeks' time, I was called into his office and he wanted to know what the conditions were, what the set-up was, and I told him that as near as I could, and he said, 'It just can't be paid'. And he brought out a little looseleaf ledger showing the cost of gasoline, the cost of tires, and the miles run on the different divisions and the rates of pay, and he said, 'You go back and tell these men that it can't be done'.

"I said, 'Mr. Kuse, I know all that, but here is the Pacific Greyhound line, which is a subsidiary of the Southern Pacific. Their wages are far greater than ours; the S. P. & S. Railroad, their boys on their bus line, they are getting three cents a mile; the North Coast Transportation Company, their drivers have got a 30-cent increase'. * * *

"30 cents per day. And I said, 'Here are the drivers on the Union Pacific Stages without anything'.

"I said, 'If you can explain that to the men, why these other companies can pay and the U. P. can't, you can do better than I can'.

"And he said to me, 'Would you fellows be glad if you got 30 cents a day?'.

"I said, 'No. We still have taken a cut of $1.90 a day, which we took some years ago'. And then I said, 'To be fair, to bring us into somewhat the right proportion, to what the other companies are paying, if you will give us $1 now and then

we can arbitrate the 90 cents difference later on, or whatever is agreed upon'.

"He said, 'It can't be done. The stages will be locked up first'."

This took place before the Union had been organized and before any agreement between the Union and the Company had been entered into. The respondent sought to show that its scale of wages was higher than any of the three competing companies named by Van Avery in his testimony but the testimony was ruled out on the objection of the Union as being immaterial.

On cross-examination, Van Avery was forced to admit that during 1933 and 1934, or prior to the organization of the Union, respondent had three times increased the pay of its drivers. On March 16, 1933, when the banks were closed and business was very bad the compensation of the drivers had been reduced and as a result of this pay cut Van Avery was getting $5.60 per day. The way the increases affected him was as follows: On July 1, 1933, he was raised to $6.10; on November 1, 1933, to $6.60; on October 1, 1934, to $7.50. This was the pay per diem at the time that the Union was formed and when the first agreement was entered into between the Company and the Union on February 23, 1935, which was to be in effect for the period of one year. In that agreement it was stipulated that "present basic hours of labor and scale of wages shall be continued and maintained during the life of this agreement."

Also, as a basis for the finding, the Board prints in the appendix to its brief the following statement made by Mr. Manning, superintendent for respondent, called as a witness for petitioner:

"Q. Do you remember what he [Mr. Walsh] said about the union's responsibility for that wage scale and what he wanted them to understand about it? A. I don't remember his exact words, but I remember that he recited to the boys that the increase was asked for in August when we had received our first six months' figures for the year, and it looked at that time that the company was going to make a good showing for the year, so that in August he sent an increase in for the men, which request went to New York City. It came back for a few changes and revision and it was again sent to New York City, and he received it just before he went out on the trip. * * *

"He told the boys that it was not a question of grabbing $150,000 out of the company, that it was a long hard job to get this money and that he understood that there was a rumor out here, as I remember his words, that the union had insisted that they get this raise, or that the union had got the raise, and he wanted to explain to the men that they would get every dime that the company could afford to pay them, and that that was predicated upon the business done by the company, and as long as he was president of the company he would do everything that he could to give them every dollar that they could afford to give them, consistent with good business, and he wanted to let them know that it was a matter of getting money out of the Union Pacific Railroad, and it was not a matter of getting it within 24 hours. That was the gist of it, as I remember it. * * *

"Trial Examiner Hazel. What was the occasion of any conversation at that time?

"The Witness. We were giving the boys an increase in pay, and had a banquet at various places along the line. Our seasons end in November, and at that time we can tell what our business for the year has been. * * *

"Q. If I understand you correctly, it was Mr. Walsh's position that as long as the company made money to pay the wages, they would be given to the men, and that it was a matter that the union had nothing to do with. That is what I understood you to say. It was a matter of revenue rather than bargaining? A. He didn't say it exactly that way, but that is the thought.

"Q. And he also said at that time, didn't he, that so far as the treatment to be given the men was concerned, they would be treated just the same regardless of this union, that they didn't need a union to safeguard any of their rights? He told them that, didn't he? * * * A. Yes. * * *

"Q. Did he say that they didn't need to pay tribute in to the union, if they didn't want to? A. I don't know whether he said that, or said that they didn't need to pay tribute, at that particular time, but I have heard him say that they didn't need to pay tribute, at meetings with the men.

"Q. At other times? A. Yes."

The only other evidence cited by petitioner to support the finding is that of one of the drivers who testified that Walsh said, "The Union had no bearing on the

men getting this raise, that he was doing it voluntarily," and "that the men didn't have to belong to any union; if they didn't want to belong to any union, they would still have their jobs." No effort was made to show that Walsh's statements were in fact untrue. The mere making of them is held to be a violation of the Labor Act.

The evidence shows that the Company was conducting its business on the open shop basis; in doing so the respondent was within its legal rights. If the talk of Walsh its president, amounted to no more than a declaration of that policy it did not violate the Act.

As a part of the same paragraph which refers to Walsh's activities, which we have just commented upon, the Board continues: "Manning had recourse to the same strategy. In July, 1935, the respondent having been advised through the Union of a grievance on the part of one of its Spokane employees, George Auld,—the matter related to back pay and was clearly contemplated in the provisions of the agreement—Manning nevertheless made an adjustment directly with Auld, stating that 'he didn't want anyone that was not satisfied, that the union could not get him anything that the company could not give him.' In view of the agreement which existed between the respondent and the Union, it is difficult to deduce anything from these activities on the part of the respondent's officials other than that they were attempting to circumvent the provisions of the agreement by arousing in the employees the feeling that it was superfluous to negotiate with the management through the Union. It is clear that such conduct on the part of the respondent constitutes interference with the rights of its employees guaranteed by Section 7 of the Act [29 U.S.C.A. § 157]."

Concerning this matter the testimony of George Auld of the Spokane division shows that in July, 1935, he had a grievance of some kind relating to "some back pay or some claimed pay," that he had not received; that he was unable to adjust the matter with the superintendent at Spokane. He thereupon transmitted his grievance in writing either to the local committeeman, or Van Avery. He was then asked:

"Now, what was the next thing that happened in regard to that particular grievance? A. Well, Mr. Manning came to Spokane and he asked me what it was, and we settled it there.

"Q. Between yourselves? A. Yes, sir.

"Q. Did he say anything in that conversation about not needing the union in settling that? A. No.

"Q. What did he say? A. He said he didn't want anyone that was not satisfied, that the union could not get him anything that the company could not give him.

"Q. That matter was closed satisfactorily? A. Yes."

Concerning this settlement with George Auld, General Superintendent Manning testified:

"A. Well, that was brought up at a meeting. I could not tell you what meeting it was. It was one of the meetings that we had here in Portland with the committeemen, and all of them were discussing the matters before us generally; and that was brought up. We were changing our schedules up there, and that left this boy driving two long trips, where, heretofore, he had driven a short trip and one long trip. It was understood here, as I remember it, by Mr. Van Avery that I would call this boy when I went over to Spokane and work it out satisfactorily with him, and he said that that is all that is necessary. Mr. Van Avery said, 'If he is satisfied, I am satisfied.' So I went to Spokane and talked to him, and he explained the situation to me, and he told me that on being placed on this long run, it cost him his dinner, because he missed his dinner at home, and he was out that additional expense; and I asked him how much he thought it was worth, and he said '50 cents' and I said, 'We will pay you that 50 cents extra a day,' and he said that that was all right.

"Q. At the time you made the arrangements, did you know that there would be any criticism of you having taken that matter up with him? A. Absolutely not. I didn't pay any attention to it.

"Q. When was the first time that you ever heard of any criticism of your having done that? A. Right here.

"Q. When it was brought out in the hearing? A. Yes.

"Q. Mr. Auld was satisfied, was he? A. Yes, sir."

We think the Board was in error when it held that the declarations of Walsh in announcing that the company had voluntarily raised the pay of its driver employees, and Manning's adjustment of the Auld matter constituted "interference with the rights of employees."

When this matter of Auld was gone into at the hearing the following occurred:

"Trial Examiner Hazel: Are you going into the merits of that controversy?

"Mr. Tanner: No, I am just going to show that they contravened the agreement that they made with the union and have not dealt with the men by collective bargaining, but have gone out and dealt with them individually.

"Mr. Shields: There is no charge in the complaint—

"Mr. Tanner: We have charged that you have violated their rights.

"Mr. Shields: There is no charge of violating any agreement.

"Mr. Tanner: They had an agreement to do collective bargaining. The statute gave them that right and the testimony is that he went out and made the arrangement with the men individually."

The above quoted finding indicates that the Board followed the position asserted by the Attorney for the Union to the effect that an employer under the circumstances was deprived of any right to make any settlement of a grievance directly with an employee even as in this case where the representatives of the Union acquiesced in the suggestion that it be accomplished in that way.

This was not a correct interpretation either of the agreement or the law.

■ Section 9(a) of the Act, 29 U.S.C.A. § 159(a), contains the proviso that "any individual employee or a group of employees shall have the right at any time to present grievances to their employer." Thus the Act does not inhibit adjustment of individual grievances directly between employee and employer and such procedure is entirely consistent with collective bargaining in matters affecting employees as a class. This view finds support in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. Here, again referring to the case of Virginian R. Co. v. System Federation, supra, the Supreme Court at pages 44 and 45, 57 S.Ct. at page 628, said: "We also pointed out that, as conceded by the government, the injunction against the company's entering into any contract concerning rules, rates of pay and working conditions except with a chosen representative was 'designed only to prevent collective bargaining with anyone purporting to represent employees' other than the representative they had selected. It was taken 'to prohibit the negotiation of labor contracts, generally applicable to employees' in the described unit with any other representative than the one so chosen, 'but not as precluding such individual contracts' as the company might 'elect to make directly with individual employees.' We think this construction also applies to section 9(a) of the National Labor Relations Act."

The first agreement expired on February 23, 1936, and a second conference took place between the representatives of the Union and respondent's officials on that date. There were several matters up for discussion but seniority was the outstanding feature. The officials of respondent had received from the drivers of the Spokane Division a written communication stating that they did not want the agreement changed to provide for open seniority which was what the representatives of the Union were insisting on. The 1935 agreement had contained the provision that "Seniority rights of drivers may be exercised only in the case of vacancies, new positions and reductions of force." The Union representatives proposed that this rule be changed so as to permit "bumping," which would provide that any driver on any run could be "bumped" out of his run by any older driver in the division who might prefer that run. Upon being shown this communication from the Spokane drivers, and after some further discussion, the Union representatives stated that they would go out and canvass the situation and ascertain the wishes of the drivers. Mr. Walsh said, "O. K. if you are going to put it up to the men that is all right."

Upon the hearing a discussion arose between counsel representing the Union and respondent's attorney as to certain legal questions involved in the fixing of seniority rights. It was there and is here contended on behalf of respondent that negotiations between the Union and the employer ordinarily are with respect to general working conditions, hours of labor and wages, and such matters where the interests of all the employees are the same and where any advantage secured by the Union for one member inures to the benefit of all; but that this is not true with respect to the question of seniority where the interests of the older and the younger employees are directly in conflict. The existence of this legal phase of the con-

troversy was admitted by Union counsel at the hearing. Moreover, as the evidence discloses, matters of seniority primarily concern the relation of the employees, not to the company, but to each other. Rights taken from those new in the service go to benefit the older employees in the company. Thus any change of seniority status established by the contract would affect the personal rights of the individual employee rather than those of the group. Respondent's officials were aware of the grave importance of this question which had been the subject of litigation in a case to which one of respondent's subsidiary corporations was a party. Burton v. Oregon-Washington R. & Nav. Co., 148 Or. 648, 38 P.2d 72.

It had been held that general authority of Union spokesmen did not include the power to waive the individual seniority rights of employees to the personal advantage of those who are the spokesmen, who are all older in the service. Piercy v. Louisville & N.R. Co., 198 Ky. 477, 248 S.W. 1042, 33 A.L.R. 322, 327. Since this hearing there have been other decisions.

Another aspect of this seniority question developed at the hearing seems to have been overlooked by the Board. In cross-examining Van Avery, the President of the Union, counsel for respondent was seeking to bring out that there was a difference of opinion among the men as to what the rules of seniority should be. Also, that there was a conflict of interests between the older and younger men in the service. The Trial Examiner thought that this was immaterial. Counsel for respondent replied that ordinarily he would not think it material, but said he, "I am trying to clarify the issue by this witness who has given testimony which would cause an inference that, because the management insisted on having it clarified, that they were opposing collective bargaining and not cooperating with the Union. If counsel will assure us they were making no adverse inference against the Company because we wanted this matter clarified,—" Here the attorney for the Union interrupted, saying, "Counsel has misconceived the purpose of that testimony. *It was not to leave that inference,* but the purpose of that testimony was to show that the management had violated the rights guaranteed by law to the employees, guaranteed under the Act, which provides that they must bargain with the men collectively; and we showed by that testimony that the management had bargained individually and had contravened the Union thereby, \* \* \*." [Italics supplied.]

So it appears that this testimony was not intended to convey any of these adverse inferences against the Company which the Board now draws. This testimony was introduced solely to present the purely legal question as to whether it showed that the Company by its action had bargained individually with the drivers thereby contravening the statute. This was definitely stated by counsel. After the issue had thus been made clear the Trial Examiner remarked, "Of course, this complaint does not cover that", to which the attorney for the Union replied, "Section 9A covers it."

Now it is a fact, as appears from the record, that in making up its findings and conclusions the Board held that the allegation contained in the amended complaint, which was this paragraph 9A, was not sustained and it was dismissed; but curiously enough this evidence introduced for a definitely different purpose and addressed only to the amendment is now made to do service for the very inferences which respondent's counsel sought to obviate by cross-examination but from which purpose he was dissuaded by assurances that no such inferences were intended.

Possibly we would be warranted in disregarding this particular finding by deciding that the use of this evidence for purposes disclaimed when cross-examination was diverted was not justified, but we will proceed to examine the statement of the Board in detail and show that in any event the inferences are not supported by the evidence.

We continue the narrative in the language of the Board: "The representatives of the Union thereupon requested an adjournment of the meeting in order to investigate the attitude of the Spokane employees. Walsh retorted: 'If you are going to go out and contact the men, we are certainly going to have Mr. Manning go too.' Manning accordingly arrived at Spokane and interviewed about 15 drivers. The Union representative of the Spokane employees, Lester Grimm, reached Spokane after Manning's arrival, and found his fellow employees uncommunicative and changed in attitude. In one instance,

Grimm testified, he had spoken to a new driver prior to the conference, and had found him friendly and sympathetic toward the Union. On his return, however, the driver refused to answer the Union's questionnaire, or even to speak to Grimm."

Footnote by the Board:

"The total number of drivers in the Spokane division was 24 or 25.

"The question of seniority was finally settled in the Spokane territory by a ballot conducted jointly by the respondent and the Union. The Union won, by a vote of 12 to 11."

██ The paragraph from which the above quotation is taken and the one which follows it in the findings of the Board are intended to convey the idea that respondent's officers, Walsh and Manning, seized upon this seniority dispute, designedly, for the purpose of delaying any agreement; and that Manning's contact with the drivers was to obstruct collective bargaining. Our comment on some of these activities will be made hereafter in connection with our consideration of the discharges of certain of respondent's drivers which occurred about that time. Here we will confine our attention to the statements concerning the activities of the witness Lester Grimm.

When at the meeting it was announced that Manning was to check the attitude of the Spokane drivers on this vexing seniority question there was no objection from the Union representatives. Further there is no evidence that he did anything to influence the action of the drivers notwithstanding that it is so intimated in the findings of the Board. Indeed, the evidence contradicts the Board. The statement is, "The Union representative of the Spokane employees, Lester Grimm, reached Spokane after Manning's arrival, and found his fellow employees uncommunicative and changed in attitude. In one instance, Grimm testified, he had spoken to a new driver prior to the conference, and had found him friendly and sympathetic toward the Union. On his return, however, the driver refused to answer the Union's questionnaire, or even to speak to Grimm."

The evidence of different witnesses places the number of signers of the petition opposing any change in the agreement relating to seniority from 13 to 16. Grimm testified that in his contacts he said nothing to the drivers to influence their votes. The result of the ballot was 12 to 11 in support of Grimm's seniority stand. There were 24 or 25 drivers eligible to vote and had all of those who signed the petition of remonstrance voted for the views therein expressed, the result must have been different. It is obvious then that Manning, if he accomplished anything in view of all the evidence, it must have been to bring about an opposite result from that which is attributed to him.

Again it is stated that Grimm found his fellow employees uncommunicative and changed in attitude and this is so connected with Manning as to make it quite unmistakable that the Board places this responsibility on him. Nowhere in his testimony did Grimm say anything about any communication with or describe any changes in attitude as to any drivers except one, and for its broad assertion the Board refers to but one single instance where Grimm testified he had spoken to a new driver prior to the conference and had found him friendly and sympathetic toward the Union, but after the "bumping" issue had been raised the driver refused to answer the Union's questionnaire on the subject, or even to speak to Grimm.

To the impartial mind this is most revealing and well illustrates how the Board fell into error. The fact, as testified to by all the witnesses, is that this seniority controversy concerned the drivers particularly and personally and the respondent only incidentally. That the friction on the subject resulted from a clash of interests between the new drivers who were opposed to "bumping" and the old drivers, who, by reason of the advantage their seniority gave them, were strong for "bumping." The instance cited above by the Board is to a new driver who, presumably, was awake to his own interests. It is also conceded that this question of seniority had not been submitted to the drivers in advance of the conference and that the rank and file of the drivers did not know that a change in this regard was to be proposed for insertion in the new agreement. Thus, when Grimm had talked to this new driver prior to the meeting when he seemed to be all for him, he did not know that Grimm was intending to propose a change in the seniority rule. When it was discovered that a change unfavorable to the new drivers was being proposed they protested and it was after this that Grimm had his second contact with this new driver, found him changed, and refusing to answer questionnaires. Applying to the situation

the ordinary standards of conduct and common sense, the conclusion is inescapable that this new driver was provoked at Grimm and would not speak to him because he had assumed to bargain away the rights of the new driver rather than because of any check up on the part of Manning. Furthermore, there is no evidence in the record that Manning had ever talked to this driver. The finding rests on pure surmise.

It is pertinent to note here that this testimony of Lester Grimm in relation to the matter concerning seniority also was offered in support of the amendment to the complaint, paragraph 9A, which, as before stated, was dismissed by the Board.

For further support of its findings that respondent's officials were interfering with, and discrediting the Union, it points to the testimony of Van Avery "that the Union members became apprehensive of displaying their Union buttons and it became increasingly difficult to induce employees to serve in an official capacity in the Union because of the fear of losing their jobs." Van Avery did testify that working conditions had become more favorable since the Union has functioned in the divisions. He also testified that the men were open and above board about their affiliations with the Union and wore their buttons in plain sight. The attorney for the Union thereafter, by asking leading questions, got into the record the limitation that this was true only in the vicinity of Portland but that east of there the conditions were different. We keep in mind that the Spokane Division, where the controversy relative to seniority had been waged, is east of Portland. Mr. Manning testified that as a result of this difference of views on seniority and after the agreement had been entered into which provided for "bumping" in the Spokane Division the attitude of the men there toward the Union changed; that one of the men at Lewiston, Idaho, in the Spokane Division, offered to give him 14 union buttons and cards that drivers had discarded; that this driver had said that the seniority was wrong and that he didn't like it and the rest of the boys didn't like it. This testimony was not controverted.

It was also admitted by Van Avery that during the first year the Union membership "held up good," in fact, was increasing. This was while the first agreement was in force and before the provision providing for "bumping" had been adopted.

Further proof that this change in the new agreement concerning seniority rights whereby older drivers were given "bumping" privileges and not any opposition by respondent's officials to the Union caused this decline in membership is supplied by the testimony in regard to one Zellers who, it was charged, had left the Union because of promises of promotion. Van Avery testified:

"* * * I had contacted this man Zellers,—

"Q. All right, what was his attitude? A. When I heard what his attitude was, I asked him, or told him that if the management had offered him anything, that he should carry on until after he got the promotion, and that we would then give him a withdrawal card. He said, 'The reason I am withdrawing out now, is because the management is protecting me in my seniority rights, and the organization is trying to take away from me what the management gives me.'"

The findings of the Board imply that the Company discharged Dobbs and Kiesel because of their Union activities and affiliations and to discourage membership therein. However, the evidence shows that after the organization of the Union, working conditions had become more favorable and discharges were fewer. There is no doubt that one of the purposes in organizing was to curtail discipline and discharges, and the record tends to show that the Union opposed any discharges or discipline of its driver members with equal vigor regardless of whether or not the employee was innocent or at fault.

■ In reviewing this case we have generally followed the sequence adopted by the Board, particularly in considering the background of those events upon which the Board specifically relies to support its order requiring the reinstatement of the discharged drivers. As we have endeavored to point out, these findings are not supported but are contrary to the evidence. This of itself might be sufficient reason for this Court to decline to enforce the order in this particular. However, we will now consider the findings of the Board relating to the discharge of the drivers.

The complaint alleges that in March, 1936, respondent discharged Hebe Dobbs, Carroll B. Kiesel and two others because

they joined and assisted the Union. Respondent denies this allegation and insists that the dismissals were because of infractions of the rules and regulations of the Company. That Dobbs and Kiesen were both guilty of some violations is admitted, but it is asserted that these were trivial. However, the Board concedes that it would not have invaded the respondent's right to discharge these drivers except upon the assumption that respondent had seized upon these incidents as "a convenient means of eliminating troublesome union leaders."

■ This raises the critical question, did respondent act because of some valid reason which appeared to it sufficient ground for discharging these drivers, or was the action capricious or merely a camouflage as determined by the Board? The Company could not discharge them as a penalty for union activities but it has the undoubted right to do so for violations of its proper rules, regulations or policies.

The Act does not compel respondent to employ anyone; it does not require it to retain in its service one who fails faithfully to observe the rules and regulations promulgated by it to secure the safety, comfort, and courteous treatment of its patrons. It has the right to enforce policies of its own choosing with respect to operating its busses, by discharging an employee who fails to comply with the reasonable rules and regulations it may adopt. Associated Press v. National Labor Relations Board, 301 U.S. 103, 132, 57 S.Ct. 650, 655, 81 L. Ed. 953; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. In this last case at page 45, 57 S.Ct. at page 628 the Supreme Court said: "The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them." If the discharges here in question came within that category the Board was without authority to enter an order requiring that respondent reinstate the suspended drivers to their positions.

■ The Board, in its findings, seems to attach some significance to the fact that these discharges occurred during the interim between the expiration of the first agreement and the execution of the second. It will be remembered that an adjournment of the conference when the second agreement was being formulated occurred at the request of the Union representatives to enable them to ascertain the wishes of the drivers in the Spokane division in relation to the question of seniority and "bumping." It is also undisputed that the officials representing respondent agreed to consider the matter of these discharges on their merits without reference as to whether or not an agreement was in existence. In addition, they would have their rights under the law, of which they could not be deprived. So there is nothing of substance in this point, but the Board calls attention to the subject in a manner calculated to disparage respondent.

■ When negotiations were resumed on March 12, 1936, after the referendum on seniority, the Union representatives were insisting on including in the agreement a statement providing for the reinstatement of the discharged drivers, particularly Dobbs. Manning, who had been authorized to close the agreement for respondent, refused this demand. The matter was the subject of considerable discussion. At length Manning promised to make another investigation and if he found that the claim of Dobbs that his conduct had nothing to do with the Bowes' troupe having turned back their bus tickets and continued their journey by rail Manning would put Dobbs back to work. The Union representatives say that after several days discussion, and to get the agreement closed, Manning agreed to reinstate Dobbs unconditionally. It is conceded that the representatives of the Union had been instructed by their attorney that the agreement would not be binding on any matter not reduced to writing and embodied in it. When asked to explain how they came to disregard this advice of their attorney they said Manning was known as a man of his word and enjoyed the high esteem of the workers, and they relied on his promise. Manning denies that he made the unconditional promise to reinstate Dobbs, but admits that he did agree to make an additional investigation, and if facts were as Dobbs claimed, he would restore him to the service. While Van Avery and Dobbs, in their direct examination, make the statement that the agreement to reinstate Dobbs was unconditional, each of them on cross-examination admit that the conference closed with the understanding that Manning was to make a further investigation. This would have been unnecessary if Dobbs had been unconditionally promised reinstatement.

The following are excerpts from the cross-examination of witness Van Avery:

"Q. (By Mr. Shields) Now, Mr. Van Avery, in order to refresh your memory, don't you recall that, after this agreement (of March 17, 1936) was signed, and at the time the agreement was signed, Mr. Manning told you that he expected to make further investigation into the Dobbs case, and that he would make this trip over there to make that investigation? A. That he was going to contact the rail agent, or an agent over there at Nampa, and that he was coming through there by automobile, and if the report that Mr. Dobbs had as to this man's attitude was sustained, Dobbs, would go back to work on Saturday.

"Q. Then, there was at least that condition to Mr. Manning's statement, that he would make that investigation? A. To see if the Agent's statement at Nampa corresponded with Mr. Dobbs.

"Q. You knew at that time that Mr. Manning didn't have to go to Boise in order that Dobbs might go back to work? You knew that he could let Mr. Gormley know without going over there and taking Mr. Dobbs in to him and stating the matter to him personally? A. Yes, but that was Mr. Manning's own suggestion.

"Q. And the purpose of going back was in order to check up on some of the statements that Mr. Dobbs had made? A. It was that one statement.

"Q. It was limited to that one statement? A. As far as I know, yes. * * *

"Q. (Mr. Shields) Then you left it up to him (Mr. Manning) to make the investigation, whatever it was, and then if he did not find the facts as contended for by you, then he was not to reinstate Mr. Dobbs? A. No, sir; that was not entered into.

"Q. I still don't get your point as to how Mr. Dobbs' reinstatement was to be effected. A. He was to see the agent there around Nampa to get the statement that has been entered into, for this report to verify that statement. He was to get that report to see if it was true, and which in his own mind, he felt was true.

"Q. He would be reinstated? A. That he would be put back to work the following Saturday, and he told him to meet him here on Thursday.

"Q. What would happen if he found it was not true? A. There was nothing discussed as to that. * * *

"Q. The point Mr. Manning wanted to decide was whether or not this troupe cancelled their stage tickets after boarding Mr. Dobbs' stage because of difficulty that Mr. Dobbs had with them, or because they had taken the train transportation because of a difference in time schedule? Wasn't that the discussion, that—wasn't the discussion as to the investigation of that fact? A. It seems to me there was something like that."

The cross-examination of Mr. Dobbs also furnishes no support to the Board's finding. We quote the following:

"Q. And Mr. Manning wanted to satisfy himself as to which version of this transaction was correct? A. That was the impression that I got.

"Q. Your version was that Kennedy was a man that had caused all this disturbance, that the fault was his, that you were in the clear; and Kennedy's version was that the fault was all yours and that he was in the clear? A. It seemed, yes, it was that at that time.

"Q. You realized yourself, did you not, that it would be a serious matter for a troupe like the Major Bowes Troupe to cancel their passage by stage because of some misconduct on your part? A. If I were to blame, yes.

"Q. And Mr. Manning desired, did he not, or so expressed himself, that he wanted to clear that up 'and be sure that he had the facts right before he finally decided it? A. That was the supposition, yes."

Manning's testimony, together with a careful scrutiny of the cross-examinations of Van Avery and Dobbs on the subject, establishes that there was no such promise, all of which is further supported by the letter written to Dobbs by Manning on March 23, 1936, shortly after the conference and long prior to the time this matter came into dispute through the complaint made to the Board. This letter was as follows:

"In accordance with the agreement which I made with you and Messrs. Van Avery and Murray representing you in connection with the hearing of charges against you, on my return over the line from Portland I made a further check on the accuracy of the information furnished us relative to your conduct at Nampa in the handling of the Major Bowes' troupe.

"This is to advise you, in accordance with our agreement, that I am certain the

charges are fully sustained, and you will not, therefore, be returned to service."

There is additional corroboration in the statement of Mr. Frye, the railroad agent at Weiser, which was introduced as an exhibit and which will be noticed hereafter in another connection.

Dobbs was employed by respondent as a driver in 1929. Aside from one instance of disciplinary action in March, 1932, and a few reprimands for discourtesy, the respondent had nothing against his record until after the first agreement between the Union and the respondent. Subsequent to the execution of that agreement a complaint was made by the Union against Goodland, superintendent at Boise, which Manning went there to investigate. While there he learned from a member of the police force that Dobbs and another employee of the Company had been arrested for drunkenness and lodged in jail under assumed names. The rules and regulations of respondent forbid the use of intoxicating liquors by its drivers both on and off duty. As this was some months after the occurrence, and no complaints having been made and the matter not otherwise having been reported to Manning, he took no action except to reprimand Goodland, who also had heard about it, for not making a report on the matter at once. The incident at least indicates that respondent's officials were not lying in wait for some excuse to get rid of Dobbs.

On March 4, 1936, Dobbs had trouble with members of a traveling group of Major Bowes' performers. About 9:30 in the morning the bus had stopped at Nampa, Idaho, to discharge and take on passengers in the usual course of business. The bus was late and the troupe had been waiting on the platform for the bus to arrive. Joseph Kennedy was manager of the troupe. That morning, before the arrival of the bus, Kennedy purchased 14 round trip tickets from Nampa to Weiser and 14 one way tickets from Nampa to Burley.

Marshall Rogers, a member of the troupe, had in his possession a suit case constructed of fabric with metal corners, 22 inches long, 16 inches high and 9½ inches deep. It contained drinking glasses of various sizes on which Rogers played music by finger pressure on the edge of the glass. Each glass has a different tone quality and Rogers said he had been 12 years collecting the set and that it was the only one of its kind in the world. Rogers said that he always carries this case himself, never checks it and never lets a driver of a bus or porter handle it for him. He further said that he had been traveling on busses all over the country and never had any trouble before about taking it into a bus. As he attempted to board the bus Dobbs stopped him and told him that he could not take the case in. Manager Kennedy then stepped up and said that this case had to go inside. Dobbs replied that the case couldn't go in unless there was room. Kennedy said that if the glasses could not go inside of the bus none of them would go. Kennedy offered to purchase an additional ticket if the driver would permit the case in the bus but the agent said that it would not be necessary. After considerable argument between Kennedy and Dobbs it was decided that the case could go inside. Kennedy then told the agent that on account of the discourteous treatment received from driver Dobbs that he would travel by train from Weiser to Burley.

There are other varying incidents set forth in the signed statements of witnesses which were turned over to Mr. Manning and which were introduced in evidence. We have referred only to details not in conflict.

Further, in relation to this controversy, Thompson, the bus depot agent who was present, in his statement said that the argument was confined to Dobbs and Kennedy and only incidentally would another member of the troupe inject a remark; that neither of them had been drinking and he did not remember either using any profane language but he did recall that neither Dobbs nor Kennedy was particularly inclined to give up the argument; that he tried to get Dobbs to quit arguing and get the baggage loaded because he knew at the time that such argument would not do the Company any good. Both men were in an angry mood. He said that during this argument Dobbs made the remark that he was running that car and no passenger would tell him where to put his baggage. Remarks made by members of the troupe were to the effect that they had never received such treatment from any employees on any other bus or transportation lines as they had from driver Dobbs that morning. After these remarks had been passed back and forth, Dobbs finally went to the rear of the stage and started to load the baggage on top. The agent said that when Dobbs had the baggage all loaded and while he was tying the canvas cover down, Ken-

nedy was on the ground talking to the agent and had asked him the driver's name and he told him. Dobbs overheard this and remarked to Kennedy, "Well, if you are trying to get my job, go ahead." Kennedy said that he was not trying to get his job but was going to report to the proper authorities and it was out of the question for a driver to act as Dobbs had done; that the troupe were travelers and not tourists; that they were traveling all the time and should be entitled to the cooperation of employees of the Company. The agent also said that during the argument Dobbs offered to make the matter one of a personal nature with Kennedy. Dobbs admits that he told Kennedy to shut up or else. Kennedy again asked the agent if he could not buy a ticket for this case in order to avoid further argument. The agent said he again told him it was not necessary. Kennedy repeated that their return from Weiser to Burley was going to be by train.

Dispatcher Collins, employed by the Union Pacific Railroad at Nampa, heard of this trouble which occurred between Dobbs and Kennedy at the stage depot and immediately got in touch with the Union Pacific's agent at Weiser, Idaho. The following are excerpts taken from the statement of this agent, Mr. L. B. Frye, which was an exhibit introduced at the hearing: "My first information relative to Major Bowes Unit No. 7, coming to Weiser on March 4, 1936, was when Dispatcher Collins got me on phone from Nampa about 10 AM that day, and told me this troupe was coming to Weiser on a stage. He also told me they had a little misunderstanding or trouble at the stage depot at Nampa, but did not give me the nature of the trouble and I did not know what it was. However, he requested that I meet them at Weiser, and to treat them nice and courteously, and tell them that we would have a tourist car on train No. 14 that night, which leaves here at 9.50 PM, and that we would like very much for them to use it to Burley, also that he did not think they would have any trouble getting a refund on their stage tickets. That was the only information he gave me, but impressed upon me the fact that he wanted me to meet them, and treat them very nicely so we would have no trouble with them here or as far as railroad was concerned."

In this statement he also said that Mr. Kennedy told him that he had trouble with the bus driver at Nampa. "He did not go into detail of the affair but from what he did say he indicated the driver had mistreated him or abused him. I do not know if the incident at Nampa and the driver of this stage had anything to do with Mr. Kennedy changing his plans and going by train or not, and while he did not say so in our conversation, it may have had something to do with it. His original plans were to go by stage, but after I had been able to arrange to hold the train for him and provide him with the best service possible, he agreed to go by train."

Immediately after the departure of the bus from Nampa, agent Thompson went to Boise and reported the incident to Division Superintendent Gormley who at once got into his car and drove to Weiser to get in touch with Manager Kennedy of the show troupe for the purpose of persuading him to change his mind about turning in his bus tickets and purchasing railroad transportation, but before Gormley could contact him, Kennedy had already arranged with Frye for the transportation of the troupe by railroad instead of bus. Kennedy told Gormley that he had been treated discourteously at Nampa that morning and didn't feel that he wanted to use the bus.

Thus far, unless otherwise indicated, we have stated facts from the various statements introduced in evidence, and made by those who had knowledge of this controversy, and which are not contradicted. Indeed, as will later appear, Dobbs' own written statement given after he knew he had been suspended and was under investigation corroborates them. However, when testifying before the Board he contradicted this version with which he had first agreed and gave evidence at variance with these facts but which in any event fail to sustain the findings of the board as hereinafter shown.

To arrive at correct conclusions we must examine the facts in their proper setting. The various Bowes' units expend large sums of money for transportation furnished by respondent's busses; from one tour respondent received $2,100. This particular unit had been on the road continuously for more than four months. The local agents at Nampa and Boise were fearful that the difficulty between the driver and the manager of the Bowes' troupe would result in the loss of this highly valuable business because of Dobbs' conduct. The matter was deemed of such importance that, upon receiving the report of Gorm-

ley, General Superintendent Manning gave him the following instructions: " 'The first thing you do is to get hold of Mr. Kennedy and explain the situation to him and tell him it is not the thought of the management to have any trouble at all, that we want to take care of them, and the first job is to go over and sell him our service, because I don't want him to write a letter in to New York City stating that he had been mishandled, we have lots of Major Bowes' business, and we don't want to lose it.' I told him that the next thing to do was to get together the facts in the case. I said, 'That is important for two or three reasons, and one of the reasons is that we have been sued on deals of that kind.' "

Investigators were sent to find out all the facts. The reports and statements of witnesses were taken without regard to whether they were favorable or unfavorable to Dobbs. Another factor which stimulated this investigation, as the record shows, was that respondent had been sued by passengers who claimed damages for rude and discourteous treatment by its drivers. At the time of this hearing one such suit was pending. In view of all these circumstances, the respondent would have been grossly negligent had it ignored this complaint of one of its best patrons. It is obvious that the officials of the Company had nothing to do with getting Dobbs into this trouble, yet the Board, because of the occurrence and because respondent prudently undertook an immediate and searching investigation, concludes that it was merely an incident seized upon by respondent as an excuse for getting rid of Dobbs. The evidence does not support such conclusion.

The facts thus far, stated in relation to the difficulty between Dobbs and Kennedy at the Nampa bus depot, are not in dispute. We think they are amply sufficient to warrant the kind of investigation that was undertaken by the Company and which the Board views with suspicion because it was immediate and vigorous. The officials would have been neglectful of their company's interests had they acted otherwise.

Be that as it may, the investigation went forward and in addition to what has already been detailed, the written statements of members of the troupe other than Kennedy made within a day or two after the occurrence variously characterized Dobbs' conduct as "unfriendly," "discourteous," "tough," "almost warlike," "arrogant," "insulting," "antagonistic."

The charges of discourtesy were bad enough, but a more flagrant violation of the rules and regulations of the Company was Dobbs' ultimatum to Kennedy that he was tired of listening to his remarks and he would have to shut up or fight. The rules of the Company forbid its drivers to engage in such conduct even under provocation. At the hearing there was read to Dobbs from the manual the following: "Drivers must extend the utmost courtesy to the public in all their contacts as they are the company's representatives. They must not, under any circumstances, engage in arguments. A smile will do more good. Drivers must report their differences to superintendents for settlement. A driver must not use boisterous, profane or vulgar language while on duty."

Dobbs said he was thoroughly familiar with it.

The Board treats this incident both as a trifling matter of small importance while at the same time accepting the view that Dobbs was right and justified in what he did. In its findings the Board embodies the following: "Kennedy thereupon became irritated, and asserted that 'No God damned stage driver is going to tell me what to do,' and added, 'This is going inside or we won't go.' In the course of the argument which ensued, Dobbs, resenting a 'personal' remark made by Kennedy told the latter either to 'shut up' or to 'settle' the matter immediately. Kennedy quieted down, and nothing more was said. He was friendly during the course of the ride with Dobbs from Nampa to Weiser, Idaho, a distance of 65 to 70 miles. Dobbs did not consider the incident unusual and attributed its occurrence to the temperamental nature of 'show troupe people'."

In the argument in its brief for enforcement of its order it refers to the record of Dobbs' testimony as justifying the following statement: "Kennedy thereupon became irritated, and asserted that 'I am God damned tired of having drivers tell me what to do. No God damned stage driver is going to tell me what to do', and added, 'This is going inside or we won't go'. He referred to Dobbs as a God damned son of a bitch. Dobbs, resenting this 'personal' remark made by Kennedy, told the latter either to 'shut up' or to 'settle' the matter immediately. Kennedy quieted down, and nothing more was said. He was friendly during the course of the ride with Dobbs from Nampa

to Weiser, Idaho, a distance of 65 to 70 miles."

We take from the record of Dobbs' testimony the following:

"Q. What did he say? A. He said it would go in, anyway, and 'Furthermore, I will get your job', he said.

"Q. What did you say to that? A. I said, 'Okeh, but while I am here I am going to live up to the rules of the company and that goes'.

"So, at the time I was loading my baggage, which took about 15 minutes, and during this time this man walked back and forth in front of the bus raving and cussing,—

"Q. Did you hear what he said? A. A part of it.

"Q. Did he make any statements about you? A. Yes.

"Q. Profane or otherwise? A. Profane.

"Q. What did he refer to you as? A. God damned stage company; God damned stage drivers; God damned son of a bitch; son of a bitch this and son of a bitch that.

"Trial Examiner Hazel: This was at the stage company depot at Nampa?

"The Witness: Yes.

"Q. (By Mr. Tanner, continuing) Did you go on along with your work? A. I continued to load the bus and nothing was said, not another word was said by me.

"Q. Did he encounter you any further? A. I got through, and as I got through he made a remark to me which sounded directly personal and as I had heard a part of the profanity, I resented the fact that he was making a personal issue of it towards me.

"Q. Did he tell you,—did you tell him he would have to shut up? A. Yes.

"Q. Did he shut up when you told him he would have to shut up? A. Yes."

The quotation hardly serves to support the findings and also reveals in a milder way than usual the method of leading the witnesses which characterizes the examinations conducted by counsel for the Union, comment upon which will be made elsewhere. The above quoted testimony was given at the hearing in August, 1936. The event occurred on March 4, 1936. Dobbs was suspended the next day. He was told his conduct in connection with the Bowes' troupe was undergoing a vigorous and searching investigation. After being thus advised, on March 6, 1936, he gave a signed statement from which we quote the following which appears above his signature:

"As I was tying the canvas on the roof, this fellow [Kennedy] was talking to Thompson and the impression that I got from what little I could hear of the conversation was that he wanted Thompson to give him the figures as to transportation with the possible or obvious intention of demanding a refund and continuing the trip on the train. And it also seemed to be his intention that he wanted Thompson to so report the matter to the Management that the blame for this loss of business would be thrown directly at me for my request that this luggage be left outside and placed upon the roof of the stage.

"In view of the fact I had said nothing further to this man it seemed that he had said sufficient for my benefit to the effect of what he intended to do and it seemed that he was just pouring all these additional remarks on for my benefit and naturally he put the matter to Thompson in such a way that the latter would in explanation of the fact the return trip revenue would be a loss, would have to throw the blame onto me for this loss as a result of this man's actions, and it would naturally throw Thompson into that position.

"At that point, then, I told this fellow— 'Of course, I can't stop you from doing anything you can to gain your purpose, but if you want to make it personal, it appears to me, I can get down and we can settle it right here, and either do that, or shut up, as I have heard enough of it'. He then shut up."

If he had suffered all this blasphemous abuse he now claims he could hardly say as he did that he did not consider the incident unusual; moreover, he certainly would have mentioned it in his own defense had it been true. That the vileness of the language did not deter him is evident from his statement, because at another place he makes use of well known abbreviations for similar profanity in quoting a reference which he attributes to another passenger having applied to the manager of this troupe. It is remarkable how Dobbs' signed statement given just after the occurence coincides with that of Agent Thompson.

To climax the evidence which "points unmistakably to the conclusion that Dobbs was discharged because of his Union activity," the Board recites "At the hearing, it was testified by driver George Perry that

he had been informed confidentially by Manning's assistant, Mr. Motz, that Dobbs' discharge was due to his causing the respondent all the trouble he could, and that Dobbs had been discharged at the first opportunity." There is nothing in the evidence of this witness which indicates any confidential discussion, and there is nothing concerning union activities, only the witness's inferences. The witness said that Mr. Motz was riding with him from Burley to Boise.

"Q. What did he say? A. Generality mostly until we stopped for lunch at Burley.

"Q. And when was this? A. About three months ago.

"Q. At any rate, it was shortly after Mr. Dobbs was discharged? A. Sometime after Mr. Dobbs had been discharged, yes.

"Q. Go ahead. What did he say, as far as you can recall? A. Mr. Motz didn't say much of anything until I myself brought the subject up, and we were speaking of the union and the men up and down the line, and I said that I would be very glad when this was all over with and we became one union.

"Q. What did you mean by 'glad when this was all over with?' A. I meant this particular hearing that we were waiting for at this particular time. That is what I had reference to.

"Q. Go ahead. A. And he apparently understood what I meant. He said that it is just one of those things, 'Keep your nose clean and go about your job.' And then, on the porch outside, we were talking,— he said that he had seen Mr. Hebe Dobbs at Pocatello, and that he had gone over the line from Boise to Pocatello begging the boys,—

"Q. He said that he saw Hebe Dobbs? A. Yes, and that he said Hebe was down there in Pocatello and he was trying to get the boys to donate a day's pay to fight his case, and that they wouldn't go for it. I don't know how the conversation came up, and it led from one thing to another and Mr. Motz said to me, 'Harry, suppose you are running a grocery store and you have five men working for you, and four of them are damned good men and the fifth one causes you all the trouble he can cause you, what would you do?' I said, 'In that event, I guess I would fire him.' He said, 'That is exactly what the company did with Hebe.' At that time it was time to leave and that terminated the conversation."

This witness was asked on cross-examination:

"Q. (By Mr. Shields) Did he mention to you the fact that there had been complaints made of Mr. Dobbs' rude treatment of passengers? A. No, sir; he did not.

"Q. Did he mention to you specifically what it was he had in mind when he used the grocery store incident of a person causing trouble? Did he himself say what he had in mind, or did you just draw your own inference? A. I drew my own inference."

When Motz was having this talk with Perry, he was respondent's assistant superintendent. He knew about Dobbs having been reprimanded for discourtesy; knew about his having become intoxicated and being lodged in jail under an assumed name; knew about the loss occasioned to the Company by his conduct toward the Bowes' unit; knew of him having been drunk, disorderly and quarrelsome about the bus station at Boise shortly before this conversation. These matters were all present in Motz' consciousness when he used the simile of the grocery stores. If Perry had known about them his inferences would doubtless have been different. A serious finding whereby a large operating transportation company is deprived of authority to discharge an unfaithful employee for grave infractions of its regulations must be rested upon something more substantial than an inference from another inference so uncertain as this.

There is another additional and conclusive reason why respondent should not be required to restore Dobbs to a position as driver of its busses.

It was brought out at the hearing, and not denied by Dobbs, that at the very time his union was pressing before the Board this demand for his reinstatement and when presumably he would be on his good behavior, reports were lodged with Superintendent Manning that Dobbs, on April 7, 1936, had appeared at a public lunch counter located in respondent's depot at Boise; that at the time he was intoxicated, his eyes were blood shot, his face was flushed, his tongue was thick; he was in an ugly, quarrelsome mood, and threatened to beat up one of respondent's drivers, who had never had any trouble or acquaintance with him and that he was only restrained from carrying out his fell purpose by the intervention of a number of other drivers, among whom were some of his fellow members of the Union, all of whom attest to this incident.

The rule of the respondent required that drivers "must not under any circumstances engage in arguments." The company properly may require its drivers to avoid quarrels with patrons, even though the patron may in fact be wrong, just as it may require that they shall not drink, either on or off duty.

To compel respondent to reinstate Dobbs as a driver of its busses in the face of the flagrant, repeated and public violation of its rules and regulations committed in the presence of other employees, besides being utterly destructive of all discipline and a gross injustice to respondent, would be contrary to the public interest.

The confidence reposed in these drivers is of a higher order and is not to be compared with that of workers in shops or mines or lumber camps. They represent the carrier in its relations with the public and the carrier is responsible for their conduct in the line of duty. As a common carrier of passengers, respondent is charged with the utmost skill, care and diligence consistent with its business. Richardson v. Portland Trackless Car Co., 113 Or. 544, 233 P. 540.

The carrier's duty not only extends to matters immediately concerned with the act of transportation, but includes protection from the personal misconduct of the carrier's servants. It is the company's duty to give passengers courteous treatment. The use by an employee of rude or discourteous conduct will afford a passenger so offended a right of action against the carrier for damages. 10 Am.Jur., Sec. 1443, p. 261.

The order of the Board directing respondent to restore Dobbs and Kiesel assertedly rests upon the same background which has already been commented on and will not be repeated. If that background as developed by the Board is wrong, then it follows that its determination that the discharges of Dobbs and Kiesel were the result of their union activities and not because of their admitted violation of regulations is likewise wrong. Brief consideration will now be given to facts peculiar to the discharge of Carroll B. Kiesel.

On various occasions over a considerable period of time Kiesel had been reported for rude and discourteous conduct toward passengers. He had been reprimanded for this several times. There was apparent improvement for a while and it is pointed out that Kuse, the superintendent under whom he worked part of the time, specifically noted the change and complimented Kiesel on his improvement. It should be noted that this was during the time when Kiesel was more active in the work of the Union. Later, and when Kiesel had ceased to be an officer of the Union, a number of violations by Kiesel of the company's rules and regulations were reported to the respondent. Some of them for discourtesy and improper treatment of passengers; some for failure to issue required receipts when cash fares were paid; and various other inattentions to required duties. Manning went to Portland on March 10, 1936, called Kiesel into the office and told him he had the unpleasant duty of taking him out of the service. Manning began by telling Kiesel of the charges of discourtesy. Kiesel said he could not recall any of the instances except one which related to a lady passenger at Hood River in which connection it was asserted that Kiesel had said, "She should have a truck to carry her baggage in." He admitted some such occurrence but explained, "That was all in a joking way." He further admitted that Manning, when assistant superintendent in charge of the division, had told him that he had a habit of cutting people awfully short in his answers, and Manning wished he would try to improve, also that when Kuse was superintendent he had been called in and Kuse told him he had been turned in for being discourteous to a passenger at the depot at Portland. Kiesel admitted that Manning had a file of papers with him which he said was the record of the reports that had come in. Manning told Kiesel that he would be taken out of the service on these reports until he could clear them up. Manning offered to hold a hearing then or at any time. Kiesel did not ask to look at these reports and did not ask for a hearing, but flared up and asked for his check.

In this connection his testimony was:

"Q. At that time, didn't Mr. Manning show you the reports that had come in? A. He said they were there, but he did not show them to me. He had the record there, he said.

"Q. Isn't it a fact, that when he mentioned them, you flared up and said, 'Give me my check.' And you got out? A. I figured that was the proper thing to say, to ask for my check. I felt that was the thing to do, to ask for my check. I had been discharged, there wasn't anything else to do.

"Q. Did he ask,—did you ask for those reports? A. No, I didn't ask for those reports.

"Q. He said that he had them? A. Yes, he said that he had them there. * * *

"Q. (Mr. Shields) Now, at the time that Mr. Manning advised you of these records and that he would have to drop you from the service, did you ask for a hearing? A. I didn't say anything about a hearing. I told him I would take it up with Mr. Van Avery, and Mr. Van Avery would decide what to do. I first said I didn't want any hearing, and then I said I would take it up with Mr. Van Avery and he would decide whether or not there would be a hearing.

"Q. Some time in the first part of the conversation you stated that you did not want a hearing? A. Yes, at the first I did, and then I stated that I would take it up with Mr. Van Avery whether there would be a hearing. * * *

"Q. Then, you don't know what Mr. Van Avery did? Mr. Van Avery will be the man to testify as to what took place from there on. A. I don't know what took place after that."

Mr. Manning testified that at the time he took Mr. Kiesel out of the service he acted on these reports; that he honestly felt that Kiesel had been given a fair opportunity to change his habits; that he had been told about them and had shown that he could do better when he wanted to; that he had been treated fairly and the fault was his own. He said further, Kiesel's union affiliations had no bearing on the matter and the same course would have been taken if he were not a member of the Union.

Because respondent had endured for a long period and had frequently condoned these repeated breaches of its rules and regulations by Kiesel the Board seems to have concluded that he should be altogether immune from discharge and that respondent's final determination that Kiesel was unwilling to conform, "was such a sudden change of attitude" as to evidence an ulterior motive.

█ The Act is aimed to effect an important purpose in the relations between labor and capital and the legislative branch has deemed it wise to relax the strictness of procedure with which judicial proceedings are surrounded. This was not to encourage loose practices or set aside or abandon the rules of evidence which the test of experience has proven are best suited to ascertain the truth of a controversy, but to meet certain exigencies which might arise by reason of exceptional circumstances. This discretion should be used wisely and only where necessary to meet some special need.

In this case much hearsay testimony was received without any requirement of actual corroboration where direct testimony would seem to have been available; leading questions by skilled counsel were permitted on the most vital issues whereby the very answer desired was put into the mouth of the witness.

█ We have carefully examined the evidence in this case, not for the purpose of making our own findings, but to ascertain if the findings made by the Board are supported by the evidence. Because the discharged drivers admittedly were guilty of infractions of the respondent's rules and regulations the Board has sought to show that these breaches were trifles and that the real reason for the discharges was the union activities of the drivers. It thus ignores or minimizes the violations and bases its order on what is referred to as "background," which we have shown is not correctly presented or rightly interpreted and therefore not to be relied upon. Not only is there no evidence which shows that respondent was seeking for an opportunity to discharge these drivers, but there is affirmative evidence to establish the contrary conclusion.

These men had belonged to the Union from its organization and there appears to have been no inclination to interfere with, or penalize them for their activities, although several occasions for such action had presented themselves. There is no showing that Kiesel's union activities had anything to do with his discharge. Quite the contrary. While he was most active as secretary of the Union he had been favored with leaves of absence for long periods during busy seasons. He had been commended for improvement in his conduct by Kuse, who had previously reprimanded him. At the time of his discharge he was no longer secretary and was not active as he had been in union affairs. Dobbs makes no denial of the testimony that another superintendent, Goodland, whom the Board specially stigmatizes as an opponent of the Union, had shielded him by failing to report the fact that during the same period he had been lodged in jail for drunkenness, under an assumed name, a violation of the company's rules for which he could have been discharged, and that Superintendent Manning, who

learned of it some months later, likewise overlooked the incident.

At about the time Dobbs and Kiesel were discharged other drivers who did not belong to the Union were likewise discharged, which indicates no purpose on the part of respondent to discriminate between drivers who did or did not belong to the Union.

There is here no question of the organization of a union, no question of strike, of working conditions or wages— the wages of the drivers having been advanced above amounts called for by the contract. The conflict here arose from a condition which reveals that respondent was becoming involved in litigation and was suffering losses because of carelessness and negligence of some of its drivers and the insistence by the company upon a stricter compliance with its reasonable rules and regulations. Those who failed to cooperate were discharged; this policy was inaugurated before the Union was organized.

The National Labor Relations Act was not intended to empower the Board to substitute its judgment for that of the employer in the conduct of his business. It did not deprive the employer of the right to select or dismiss his employees for any cause except where the employee was actually discriminated against because of his union activities or affiliation. It did not authorize the Board to absolve employees from compliance with reasonable rules and regulations for their government and guidance. The Act does not vest in the Board managerial authority. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

The Board vaguely sanctioned certain statements of evidence by mingling them with its findings, without noting, as we have pointed out, that this evidence had been changed or modified upon cross-examination, or shown to be incorrect by other admitted or established facts. From a careful consideration of all the evidence the Court is satisfied that there is no substantial basis for the finding that the drivers were discharged because of their union activities.

It is suggested that this court should accept the findings of the Board; that contradictions, inconsistencies, and erroneous inferences are immune from criticism or attack by Section 10(e) of the Act, 49 Stat. 453, 29 U.S.C.A. § 160(e), which provides that "the findings of the Board as to the facts, if supported by evidence, shall be conclusive." But the courts have not construed this language as compelling the acceptance of findings arrived at by accepting part of the evidence and totally disregarding other convincing evidence.

"We are bound by the Board's findings of fact as to matters within its jurisdiction, where the findings are supported by substantial evidence; but we are not bound by findings which are not so supported. 29 U.S.C.A. § 160(e) (f); Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301 U.S. 142, 57 S.Ct. 648, 650, 81 L.Ed. 965. * * Substantial evidence is evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences. Cf. Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 339- 343, 53 S.Ct. 391, 393, 394, 77 L.Ed. 819." Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985, 989.

"'Substantial evidence' means more than a mere scintilla. It is of substantial and relevant consequence and excludes vague, uncertain, or irrelevant matter. It implies a quality of proof which induces conviction and makes an impression on reason. It means that the one weighing the evidence takes into consideration all the facts presented to him and all reasonable inferences, deductions and conclusions to be drawn therefrom and, considering them in their entirety and relation to each other, arrives at a fixed conviction.

"The rule of substantial evidence is one of fundamental importance and is the dividing line between law and arbitrary power. Testimony is the raw material out of which we construct truth and, unless all of it is weighed in its totality, errors will result and great injustices be wrought." National Labor Relations Board v. Thompson Products, Inc., 6 Cir., 97 F.2d 13, 15.

See, also, Ballston-Stillwater Knitting Company, Inc., v. National Labor Rela

tions Board, 2 Cir., 98 F.2d 758, decided August 1, 1938.

Section 10(e), supra, also provides that to enforce its order the Board must file its petition together with a transcript of the entire record of the proceedings and thereupon the court "shall have jurisdiction of the proceeding and of the question determined therein, and shall have power * * * to make and enter upon the pleadings, testimony, and proceedings set forth in such transcript a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board." The language quoted is practically identical with that used in the Federal Trade Commission Act, § 5, 15 U.S.C.A. § 45. In a number of cases brought under the latter act it has been held that the clause "supported by evidence" means substantial evidence. International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431; Federal Trade Commission v. Curtis, 260 U.S. 568, 43 S.Ct. 210, 67 L.Ed. 408; Philip Carey Mfg. Co. v. Federal Trade Commission, 6 Cir., 29 F.2d 49.

The Board held that there was testimony which indicated a concerted effort to discourage membership in and discredit the Union.

Expressions of opinion by three of respondent's local superintendents, Goodland, Gormley and Kuse, which are more or less critical of unions, as testified to by the president of the Union, some of the discharged drivers and others, are cited by the Board as proof of a consistently hostile attitude toward the Union on the part of the respondent. In the main these statements attributed to these officials were denied by them. Respondent earnestly insists that such expressions, even if made, were of individual opinions and did not represent the attitude of the respondent, which it is urged was stated by President Walsh before the organization was formed, to the effect that, "If the boys wanted a union they could have it." It also contends that the settled policy toward labor unions was shown by its holding company, the Union Pacific Railroad Company, which engaged in litigation in the Oregon courts to secure judicial recognition of the principle of collective bargaining and to uphold the validity of such agreements. Burton v. Oregon-Washington R. & Nav. Co., 148 Or. 648, 658, 38 P.2d 72, 74, 75.

In passing on the discharge of Hebe Dobbs we had occasion to examine some of this evidence as it related to Mr. Goodland, one of the superintendents who was most severely attacked, and there pointed out certain inherent contradictions. In addition, it should be noted that upon complaint of the Union, Goodland was removed from Boise and transferred to another station where there was no union. At the time of his leaving the drivers in his division tendered him a banquet and presented him with a gift as a token of their esteem and shortly thereafter, unknown to Goodland, a petition was circulated and sent to the Company asking that he be returned to Boise, which was signed by nearly all the drivers, many of whom were members of the Union.

To review all the evidence concerning these various local superintendents would only extend this very long opinion and serve no purpose, since there appears some conflicting evidence in the record which although disclaimed as any expression of respondent's attitude may have been accepted by the Board as sufficient justification for its "cease and desist" order.

As to the conduct and statement of respondent's president Walsh and general superintendent Manning, the incidents stressed in the finding have heretofore been examined and disposed of. In its reply brief the Board points out, as a violation of the Act, Manning's admission that he had upon occasion said that if he had a son he would advise him against belonging to a union. In the cross-examination he gave reasons which briefly were that he thought if a young man worked diligently, conducted himself properly, and tried to advance the interests of his employer, he would fare better and get further than if he depended on a union for assistance.

It is difficult to think that Congress intended to forbid an employer from expressing a general opinion that an employee would find it more to his advantage not to belong to a union. Had Congress attempted so to do it would be in violation of the First Amendment, U.S.C.A. Const. Amend. 1. The right of workers to organize freely must be conceded. It is a natural right of equal rank with the great right of free speech, protected by the Constitution. But the right of the workers to organize is not destroyed by expressions of opinion of the employer or

employee, such as referred to above. The case is different where the employer makes use of threats to prevent organization. In the instant case, while the executives expressed themselves as wholly agreeable to the formation of the Union there are some statements attributed to local superintendents evidencing a threatening attitude, testified to by the Union witnesses but denied by these officials. In any event, as to this there appears to be some conflict in the evidence.

We find that the evidence fails to sustain the finding of the Board "that the respondent has discriminated with respect to the hire and tenure of employment of Hebe Dobbs and Carroll B. Kiesel for the purpose of discouraging membership in the Union," and the order of the Board requiring respondent to reinstate them in their former positions, or to remunerate them for any losses of pay is set aside, and the complaint with respect to the discharges of said Hebe Dobbs and Carroll B. Kiesel dismissed.

There appearing to be evidence, although disputed, that some of respondent's local superintendents have upon occasion sought to discourage employees from joining or assisting the Union and taking membership therein, which activities are disavowed by respondent, it is well that such disavowal be publicly made; therefore, the petition of the Board to enforce its order with respect to posting notice that respondent will cease and desist from any such practice is hereby granted. In all other respects, the petition is denied.

