**C. G. CONN, Limited, v. NATIONAL LABOR RELATIONS BOARD.**

No. 6848.

Circuit Court of Appeals, Seventh Circuit.

Dec. 22, 1939.

Verne G. Cawley, of Elkhart, Ind., for petitioner.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Mortimer B. Wolf, Bertram Edises, and Malcolm S. Mason, Attys., National Labor Relations Board, and Bernard L. Alpert, all of Washington, D. C., for respondent.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

MAJOR, Circuit Judge.

This case is here pursuant to Section 10(f) of the National Labor Relations Act, 29 U.S.C.A. § 160(f), upon petition by C. G. Conn, Ltd., to review and set aside an order of the Board, (10(c). The Board's answer requests the court to affirm and enforce its order. The Board issued its complaint on March 11, 1936, upon a charge filed by Metal Polishers International Union, Local No. 77 (hereinafter referred to as the Union). The essential

allegations of the complaint were denied by petitioner's answer and, upon the issues thus formed, a hearing was had before a trial examiner of the Board at Elkhart, Indiana, continuing from March 10th to the 30th, 1936, inclusive.

On June 6, 1936, the trial examiner filed an intermediate report containing his findings and recommendations, to which exceptions were filed by petitioner, and in connection therewith a brief and request for oral argument. On August 14, 1936, prior to any hearing or argument on such exceptions, and without notice to the petitioner, the Board entered an order granting permission to the Union to withdraw its charge and dismissed the complaint: " * * * without prejudice to the Board's right to reinstate the complaint upon the petition of the aforesaid Metal Polishers International Union, Local 77, for good cause shown, and, with, or without further hearing, to take such further proceedings as it may deem warranted."

On May 8, 1937, the Union filed a petition with the Board, and on December 29, 1937, filed a supplemental petition to reinstate the proceedings. On January 22, 1938, the petitioner filed its objections to the reinstatement of the proceedings and an argument thereon was held before the Board in Washington on January 25, 1938. Thereafter, on May 21, 1938, the Board ordered the charge and proceedings reinstated by the following order:

"Ordered that the petition and supplemental petition of Metal Polishers International Union, Local No. 77, requesting reinstatement of the charge and the proceedings in this case, are hereby granted, and said charge and proceedings are hereby reinstated, and it is further

"Ordered that the respondent and the Union shall have the right to file with the Board in Washington, D. C., within ten (10) days from the date of this Order, briefs or requests for oral argument on the merits, or both."

Petitioner filed its exceptions to this order.

Petitioner contends that, after dismissing the complaint, the Board was without authority to reinstate it. and to determine the issues upon the evidence introduced prior to the time of such dismissal.

This seems a sufficient history of the proceedings for the purpose of passing upon the jurisdictional question. The reason assigned for the dismissal of the cause appears to have been due to the uncertainty concerning the applicability of the Act to the instant situation, which was removed by the decision of the Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and companion cases. We do not believe, however, that the reason thus assigned is of any importance to the instant question and there is, therefore, no occasion for us to discuss how or in what manner the decisions of the Supreme Court affected the action of the Board in the respect complained of. The question is, did the Board, after its order of dismissal, have the authority to reinstate the cause and determine the issues upon the testimony theretofore heard? The precise question, so far as we are advised, has not been determined by any court. Petitioner argues that the Board has only such authority as is conferred by Statute or by its rules and regulations promulgated in conformity therewith, and that no such authority being therein found, it could not so act. Attention is called to Section 1[1] of the rules and regulations of the Board as being the only provision which has any bearing upon the matter. On the other hand, respondent calls our attention to Section 36[2] of the rules and argues that said section authorizes such procedure.

We doubt if either of these sections supplies the authority claimed. Certainly neither does so by express language. This does not mean, however, that the

---

[1] "A charge may be withdrawn only with the consent of a Regional Director with whom said charge was filed or of the Board. Upon withdrawal of any charge the Regional Director shall dismiss any complaint based thereon."

[2] "Sec. 36. Where the Trial Examiner has found in his Intermediate Report that the respondent has engaged in or is engaging in unfair labor practices affecting commerce, the Board may, upon the expiration of the period for filing a statement of exceptions, as provided in Section 34 of this Article, decide the matter forthwith upon the record, or after the filing of briefs, or oral argument, or may reopen the record and receive further evidence, or require the taking of further evidence before. a member of the Board or other agency, or may make other disposition of the case."

Board was without authority. The rule seems to have been long established that judicial, as well as quasi-judicial tribunals do not lose jurisdiction of a cause by its dismissal with a proviso authorizing its reinstatement. Welch v. Mandeville, 11 U. S. 152, 7 Cranch 152, 3 L.Ed. 299; Zadig v. Aetna Ins. Co., 2 Cir., 42 F.2d 142; United States v. Sixty-Five Cases of Glove Leather, D.C., 254 F. 211; Weisguth v. Supreme Tribe of Ben Hur, 272 Ill. 541, 112 N.E. 350.

In the Glove Leather case, the court, on page 214 of 254 F., said: "The docket entry of dismissal in the instant case as fully appears by the order pursuant to which made was not a 'final' dismissal or judgment or disposition of the case, nor was it intended to be. On the other hand, it was expressly provided in the order that the action might be revived, and its prosecution proceeded with and continued, on application and showing made."

In the Weisguth case, the Illinois Court, 272 Ill. page 543, 112 N.E. page 351, said: " * * * In case of a voluntary nonsuit upon motion of a plaintiff the court has no power to set aside the order of dismissal and reinstate the cause, unless at the time the nonsuit is taken leave is given the plaintiff to move to set it aside."

Thus, it appears that an order of dismissal, without reservation, is treated as final and the court is without authority to reinstate, especially after the expiration of the term during which the order of dismissal was entered. On the other hand, it appears that where the dismissal is had with the reservation of a right to reinstate, the court has at least the discretionary right to do so at any subsequent time. In the instant matter, the Board expressly reserved its right to reinstate and we see no reason why its authority in this respect should not be as broad as that of a court, under similar circumstances. It is argued, however, by petitioner that the action was improper because of the lapse of considerable time between the hearing before the examiner and the order of reinstatement, and that, in the meantime, conditions had changed. There might be cases, of course, in which such a situation would work to the detriment of the employer unless the hearing was continued and the employer permitted to introduce testimony regarding the changed conditions, material to the issues involved. No request was made here by the petitioner, however, to offer additional testimony as to such changed conditions, and in the absence of such request, we do not think petitioner is in a position properly to complain, nor can we see how its rights have been prejudiced. Therefore, we conclude that the action of the Board in this respect was proper and it is sustained.

For many years, petitioner has been and is engaged in the manufacture of musical instruments at Elkhart, Indiana, and their sale throughout the United States. In October, 1935, it had 700 employees on its payroll, and for the year ending April 30, 1935, its sales amounted to $2,500,000. It had a large number of departments in which its manufacturing operations were conducted, including Departments 33 and 46, referred to as the Polishing Departments. The rough polishing was done in the latter, and after that the instruments were removed to the former, where the finishing process was carried on.

On October 14, 1935, an important date involved in this controversy, there were 35 employees in Department 33, including the inspectors, but excluding the foremen, and it is around this department that the present controversy largely revolves.

Petitioner's business was such as to cause a wide variance in the number of hours which the employees worked. The busiest period of the year was during the months of September, October, November, and the early part of December. During those months, the employees of Department 33 worked on an average of 57½ hours per week, including overtime on four nights of each week. During some portions of the year the hours worked would average not more than 30 hours per week. The overtime work referred to was understood to mean the number of hours each employee worked per week in excess of 48 hours. The situation with reference to the hours of employment in 1935 was substantially the same as during the several years preceding.

Rodney J. Beckwith was Foreman of the two polishing departments; Robert B. Golden was Production Manager; Otis E. Beers, General Manufacturing Manager; Alfred L. Smith, Executive Vice President, and Philip F. Getzen the Company Superintendent.

In addition to jurisdictional allegations, not here in dispute, the complaint alleged, in substance, that petitioner had urged, persuaded, and warned certain of its em-

ployees to refrain from becoming or remaining members of the Union, had threatened said employees with discharge if they became or remained members thereof, and had discharged and refused to reinstate Reuben Molebash, Elmer Sherrill, Iral McCaw, Julius Fillinger, Theodore Nimroth and Carl Hudson for joining and assisting the Union and for engaging in concerted activities for the purpose of collective bargaining and other mutual aid or protection, and that by the foregoing acts, petitioner had engaged in, and was engaging in, unfair labor practices affecting commerce within the meaning of Section 8(1) and (3), and Section 2(6) and (7) of the Act, 29 U.S.C.A. §§ 158(1, 3), 152(6, 7). The unfair labor practices were appropriately denied by petitioner. During the course of the hearing, upon a showing that Julius Fillinger and Carl Hudson had been re-employed by petitioner, the trial examiner dismissed the complaint as to them.

On June 21, 1938, the case was argued orally before the Board, and on December 13, 1938, the Board's decision was entered affirming in part, and reversing in part, the findings and recommendations of the trial examiner. The Board's decision, insofar as here material, is summarized by respondent as follows: "The unfair labor practices.—On October 14, 1935, in connection with and as a consequence of a labor dispute involving the refusal of certain employees to work overtime upon the terms stipulated by petitioner, petitioner laid off all the employees in department 33 who refused to sign a statement agreeing to work overtime on petitioner's terms. Petitioner subsequently reinstated most of the men thus laid off, but refused to reinstate Reuben Molebash, Theodore Nimroth, Elmer Sherrill, and Iral McCaw because of their membership in a labor organization and their concerted activities for the purposes of collective bargaining and other mutual aid or protection. By these refusals of reinstatement, petitioner discriminated in respect to hire and tenure of employment, thereby discouraging membership in a labor organization, in violation of Section 8(3) of the Act. By such acts and by antiunion statements of its officers and supervisory officials, petitioner interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act, thus violating Section 8(1) of the Act."

The Board's order is summarized by respondent as follows: "In addition to requiring petitioner to cease and desist from the unfair labor practices in which it was found to have engaged, and to post appropriate notices, the Board ordered petitioner to offer Molebash, Nimroth, Sherrill, and McCaw immediate and full reinstatement to their former positions, without prejudice to their seniority and other rights and privileges. The Board further ordered the petitioner to make whole the said employees for any losses of pay suffered by reason of said refusals of reinstatement, except, however, that petitioner was not required to grant back pay during the interval from the date of the Board's order dismissing the complaint to the date of the Board's order reinstating the proceedings, and except, further, that petitioner was not required to make whole Iral McCaw for any losses of pay during the interval from the date of the Trial Examiner's Intermediate Report to the date of the Board's Supplemental Decision and Order, in which the Board rejected the finding of the Trial Examiner that petitioner's refusal to reinstate McCaw was not discriminatory."

Thus, it will be seen that the question for decision is whether or not petitioner was guilty of the unfair labor practices found by the Board. The answer thereto concerns largely, but not entirely, the refusal of petitioner to reinstate, with back pay, the four men mentioned in the Board's order.

It seems to us that the controversy must be settled largely by events which occurred between petitioner and its employees on October 14, 1935, in connection with those occurring within a few days prior, as well as subsequent thereto. It is from these events that we must determine the correctness of the Board's decision in ordering the reinstatement of the four named employees, and it is from its order in this respect that its findings and conclusion as to unfair labor practices on the part of petitioner largely must rest. First, therefore, we shall enter into a discussion of such events.

On October 4, 1935, at a meeting of the Union, it was decided to present the management a petition relating to rates of pay and overtime work. After the meeting, some of the Union members prepared a petition, written on Union stationery, and dated October 9, 1935, as follows: "We the undersigned Polishers and Buffers of Department #33 respectfully, ask an in-

crease of 15% on all piece work prices or, time and one-half for all overtime over 40 hours per week in return we will endeavor to obtain better co-operation between Employees and the Company."

On the morning of October 9th, this instrument was circulated among, and signed by, 31 of the employees of Department 33. In the afternoon of that day, the petition was delivered to Rodney J. Beckwith, the Foreman of the department, by a committee consisting of Sherrill, Ferm and Fillinger. It seems that the last two named were designated at the Union meeting as members of the Committee, while Sherrill was appointed by the employees of the department. The petition was delivered by Beckwith to Superintendent Getzen, and the Committee was advised by Beckwith that it would be notified when the Superintendent was ready for a conference. On October 14, the Committee met with Getzen, at which time it was advised that the request contained in the petition could not be granted. The witnesses do not entirely agree as to all that was said during that conference, but we think it is fair to state that the Committee was advised to the effect that if the men were not satisfied to work overtime during the busy season at the rate of pay they were then receiving, it might be necessary for the company to reopen a polishing room which had been discontinued. In that event, it would be necessary to hire new men which would mean fewer hours of employment for all in the summer when business was slack. The reasons for the company's refusal of the request were discussed and the Committee was informed by Getzen that, if it was not satisfied with his explanation, it had a right to take the matter up with the General Manager, or the Executive Vice-President.

The Committee returned to the Department and advised the employees of the result of its conference with Getzen. On that evening, the employees of that department were scheduled to work overtime but, without notifying any person in a supervisory capacity of their intention or purpose, 24 of such employees (22 of whom were Union members), at 6:00 P. M., left their employment. There is evidence that they intended to do the same each evening until their request was granted. The next morning, October 15th, these men returned to work at the usual hour. Ten or twelve of the other employees of the department continued to work the usual number of hours the previous night. The next morning, petitioner determined that it would be necessary to know how many of the employees of that department would continue to work overtime and how many would not. For this purpose, the Foreman of the department was furnished by Superintendent Getzen with two written statements, both dated October 15, 1935. One read: "We, the undersigned employees of Department 33, refuse to work any overtime, overtime to be considered any work over and above 48 hours per week." The other read: "We, the undersigned employees of Department 33, agree to work at least three nights per week overtime, as long as the volume of work makes this necessary."

Foreman Beckwith called to his desk some of the men in the department, including Sherrill, Nimroth and Molebash, and exhibited to them the two instruments, with the request that they sign one of them. The Foreman then went to each of the other employees in the department and made a similar request of them. Twenty-two of the employees signed the former and eleven the latter, and three signed neither. Beckwith delivered the instruments to Superintendent Getzen, and that afternoon, October 15, 1935, Getzen instructed Beckwith to advise all of the employees of his department who had signed the instrument refusing to work overtime, not to start any work they could not finish by 6:00 o'clock that evening, and that they were to be laid off indefinitely. This information was conveyed to the twenty-two employees who had signed the instrument refusing to work overtime, and the three who had not signed either instrument. After learning the number of employees who had signed the instrument refusing to work overtime, the executives of the petitioner inserted in a daily paper an advertisement for polishers, and on the following days, October 16th to the 19th inclusive, the petitioner hired twenty new employees to work in Department 33. Each employee, when hired, was told that he would be given a chance, and if he made good at his job, it would be permanent.

Shortly after the alleged discharge, Robert B. Golden, petitioner's Production Manager, without conferring with his superiors, discussed with some of the discharged employees, the matter of their returning to work, advising them that if they so desired he would consult with Superintendent Getzen concerning their return.

This was done and Getzen's approval was obtained. It appears twelve or fourteen of the discharged men thus were contacted, but not including Sherrill, Nimroth, Molebash or McCaw. The men thus contacted, together with several others, had conferences with various officials of petitioner and expressed their desire to return to work under the old arrangement, without extra compensation for overtime work. All of these employees returned to work on Monday morning, October 21, 1935. On Saturday, October 19th, 1935, McCaw returned to the factory and asked to be re-employed. His request was refused. Molebash, Sherrill and Nimroth also requested employment on October 21 and were refused. (The matter of the refusal to re-employ these four men will be discussed later.)

Petitioner contends that the employees who refused to work overtime on October 14th, and who signed the instrument on October 15th refusing to work overtime, were discharged on that day and that thereafter, the relation of employer and employee no longer existed. On the other hand, it is contended by respondent that they were clearly included with the protective purposes of the Act, inasmuch as their status continued to be that of employees. Reliance is placed upon Sections 2(3) and 2(9) of the Act, 29 U.S.C.A. § 152(3, 9). The former defines the term "employee" as: "* * * any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, * * *"

The latter defines the term "labor dispute" as: "* * * any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

The Board, in what is designated as "findings of fact" with reference to the occurrences of October 14th and 15th, found:

"It is clear that on October 14th the polishers in department 33 engaged in a concerted protest against the prevailing overtime and piece rates. This concerted activity amounted to a strike. The strik-ing employees intended to work as many as 48 hours per week under then existing conditions, but concertedly refused to work in excess of that number of hours. On the morning of October 15, these striking employees commenced work as usual, but in the afternoon the respondent assertedly discharged them.

"Since the polishers were striking employees they retained their status as employees, and the respondent's effort to discharge them was inoperative. In fact, the purported discharges were intended only as a tactical maneuver to break the strike."

■ With due regard for the statutory mandate, (10(e) that "the findings of the Board as to the facts, if supported by evidence, shall be conclusive" construed (Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126) to mean substantial evidence, and (National Labor Relations Board v. Columbian Enameling and Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660) as evidence which would justify, if the trial were to a jury, "refusal to direct a verdict," we must decide whether or not the finding of the Board in this respect should be sustained. At this point we pause to make the observation that we have serious doubt if we are bound by this finding of the Board, because it amounts to a conclusion, rather than a finding of fact. It would seem that the question as to whether the acts of the parties amounted to a strike, with the resultant designation of the employees as "striking employees" is a conclusion to be determined from the relevant facts. If this be a correct observation, we are not bound to accept it as a finding of fact.

[7] Irrespective, however, of our conclusion in this respect, we are of the opinion that it can not be sustained. It is argued by the respondent that the finding as to "striking employees" presents an interesting, but unimportant question. The argument follows that "the purported discharge was, in the exact technical sense, a 'lock-out,' which is defined as 'a temporary withholding of work from a group of employees by an employer * * * in order to coerce them into accepting the employer's terms.'" But that argument, to our mind, does not benefit respondent's position.

We are supplied with numerous definitions of the word "strike." They are all substantially alike and we quote from

American and English Encyclopedia of Law, Volume 24, page 123, as follows: "The term 'strike' is applied commonly to a combined effort on the part of a body of workmen employed by the same master to enforce a demand for higher wages, shorter hours, or some other concession, by stopping work in a body at a prearranged time, and refusing to resume work until the demanded concession shall have been granted."

We are of the opinion that the facts in the instant situation do not bring the discharged employees within this or any other definition of the word "strike" of which we are aware. We are unable to accept respondent's argument to the effect that an employee can be on a strike and at work simultaneously. We think he must be on the job subject to the authority and control of the employer, or off the job as a striker, in support of some grievance. Respondent, in support of its argument that the employees were engaged in a "labor dispute," states: " * * * When the men ceased work at 6 o'clock p. m. on October 14 in protest against the terms and conditions of employment insisted upon by petitioner, their concerted action was a consequence of, and in connection with, a current labor dispute, and hence precisely within the terms of Section 2(3). It is immaterial that the men's withdrawal of their labor was intended to be operative only during fixed and limited periods of time, rather than during the entire working day, as in the usual strike situation. By the express language of Section 2(3), any individual whose work has ceased in connection with any current labor dispute, retains his employee status and the protection of the Act."

Even if it be assumed that there was a labor dispute, within the meaning of 2(9) the fallacy of this argument to us lies in the fact that the employees did not cease work in consequence of such dispute. Undoubtedly, when petitioner refused to comply with their request, there were two courses open. First, they could continue work, and negotiate further with the petitioner, or, second, they could strike in protest. They did neither, or perhaps it would be more accurate to say they attempted to do both at the same time. We have observed numerous variations of the recognized legitimate strike, such as the "sit-down" and "slow-down" strikes. It seems

this might be properly designated as a strike on the installment plan.

We are aware of no law or logic that gives the employee the right to work upon terms prescribed solely by him. That is plainly what was sought to be done in this instance. It is not a situation in which employees ceased work in protest against conditions imposed by the employer, but one in which the employees sought and intended to continue work upon their own notion of the terms which should prevail. If they had a right to fix the hours of their employment, it would follow that a similar right existed by which they could prescribe all conditions and regulations affecting their employment.

In view of our conclusion that the facts do not constitute a strike, it must follow that the finding of the Board—that the discharges "were intended only as a tactical maneuver to break the strike"—is without effect.

Respondent relies upon National Labor Relations Board v. Carlisle Lumber Company, 9 Cir., 94 F.2d 138, and Jeffery-DeWitt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 112 A.L.R. 948 in support of its position that petitioner was disabled from terminating the men's status as employees for purposes of the Act. In those cases, however, the employees admittedly were on a strike and under such circumstances, of course, there can be no question concerning the applicability of the Act.

The courts have held under a variety of circumstances that the employer has a right to discharge men for any reason other than Union activity, or concerted action in favor of collective bargaining. National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; National Labor Relations Board v. Jones and Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953; and National Labor Relations Board v. Union Pacific Stages, Inc., 9 Cir., 99 F.2d 153.

The events preceding the discharges, heretofore related, lead almost undeniably to the conclusion that the men were discharged because of their insistence upon working under their own terms, which they had been advised were unacceptable to the employer. The conclusion in this respect

is such as to refute any circumstances to the contrary. For the reasons stated, we think petitioner was within its rights in discharging the employees in question and that their status as employees was thereby destroyed.

Because of the importance of the question presented, however, we are not satisfied that our ultimate conclusion be predicated upon the reasoning thus far employed. For the purpose of what follows, we shall assume the Board was correct in holding that a strike ensued, that there was no valid discharge of the employees and, that the relation of employer and employee remained undisturbed.[3] Assuming this situation, there remains for consideration that portion of the Board's decision heretofore quoted which finds that the reason of petitioner's refusal to reinstate Molebash, Nimroth, Sherrill and McCaw, was because of their membership in a labor organization and their concerted activities in behalf of collective bargaining and that by reason of such refusal, these employees were discriminated against in violation of Section 8(3) of the Act. Also, that by such acts and the antiunion statements of officers and supervisory officials of petitioner, the employees were restrained and coerced in violation of Section 8(1) of the Act.

■ Within a few days after the discharges, petitioner engaged the services of persons to take the place of those whom we now refer to as the striking employees. Its action in this respect is not subject to criticism. As was said in National Labor Relations Board v. MacKay, etc., Co., 304 U.S. 333, 345, 58 S.Ct. 904, 910, 82 L.Ed. 1381: " * * * Nor was it an unfair labor practice to replace the striking employees with others in an effort to carry on the business. * * * " On or prior to October 21, 1935, all of the striking employees had been reinstated in petitioner's service except Fillinger, Hudson, and the four employees in question here. Fillinger and Hudson were reinstated prior to the hearing of this cause before the Examiner. It seems settled that at that time petitioner was under no obligation to discharge the men who had been employed to take the place of the strikers merely to make room

for them. It was so held in National Labor Relations Board v. MacKay, etc., Co., supra, where the court, on page 345 of 304 U.S., on page 911 of 58 S.Ct., 82 L.Ed. 1381, said: " * * * And he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them. The assurance by respondent to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice, nor was it such to reinstate only so many of the strikers as there were vacant places to be filled."

■ The claim was advanced there, as it is here, that the men were refused reinstatement solely because they were active in the affairs of the Union. If so, it plainly comes within the inhibition of the Act.

Referring to these six employees, the Board found: "They were distinguished for their outstanding Union activities." This finding, if accepted, must be largely upon the testimony of one, Ray Kelsay, International Vice-President of the Union, who testified "they were the Union's most active members and had assisted in creating and fostering it." It appears the Union was organized in 1933 and that Kelsay came in contact with the local only occasionally subsequent to its organization. It will be seen his testimony in this respect is a matter of opinion rather than of fact. A reading of the testimony given by the employees themselves does not corroborate the testimony of Kelsay, but on the other hand, with the exception of Molebash's testimony, contradicts it. It is shown by the latter's testimony that he served as the first representative of the Union in petitioner's plant, conferred with petitioner's officials concerning Union affairs on several occasions, sometimes in the company of Kelsay and, of course, was a member of the Union when he sought re-employment. According to Sherrill's testimony, he was reinstated as a member of the Union in the Fall of 1934, and was one of the committee which presented to petitioner the petition, heretofore discussed, on October 9, 1935. It will be noted, however, that he was not appointed

---

[3] By this treatment of the situation, there is no occasion for us to consider the Board's argument to the effect that even though the discharges were valid, thereby severing the employer-employee status, still petitioner is guilty of discrimination in refusing their re-employment.

as a member of this committee at the Union meeting. McCaw joined the Union at the time of its organization in 1933, while Nimroth helped organize the Union and attended its meetings. Neither Sherrill, McCaw nor Nimroth ever served as an officer of the Union, nor on a committee representing the Union, and at no time consulted or conferred with any of petitioner's officials. The most that can be said for them from their own testimony is, they were members of the Union. We are unable to reconcile their testimony with the finding that they were "distinguished for their outstanding Union activities." If not, there could have been no discrimination for that reason.

■ The reason for the stress placed upon the finding of the Board with reference to the Union activities of these men is rather apparent when it is noted that all of the men discharged on October 15, 1935, except three, belonged to the Union. (These three formerly had been members, and immediately thereafter rejoined the Union.) All of the men discharged, except those in controversy, were re-employed. Thus, when all those re-employed were members of the Union, it would seem there could be no discrimination as to the men in question, unless they could be distinguished in some manner from the others, and it is sought so to distinguish them by their activities. With one exception, we are unable to learn from the record whether or not any one of the Union officials was among those discharged. The exception was the Secretary-Treasurer of the Union, who was among those discharged, as well as those reinstated.

It is also insisted that the decision of the Board must be sustained upon testimony asserted to disclose the hostile and unfriendly attitude of petitioner toward the Union and its activities, and upon threatening and prejudicial statements made by those in a supervisory capacity. We have carefully reviewed the record and we are not impressed with the position of the Board on either proposition. There is some testimony, claimed by petitioner to have been improperly received, which tends to show an unfriendly attitude prior to the enactment of the Act in question (July 5, 1935). The Board admits this testimony can only be considered for the purpose of arriving at what is designated as the "background." While we think it properly may

be considered, yet because of its uncertainty and remoteness, it carries very little, if any, weight. It seems to be uncontradicted that petitioner, at all times, was willing and did meet with Kelsay, or any committee or representative of the Union whenever requested, and that all problems presented were discussed freely and frankly. Also, there is not a scintilla of evidence that between February, 1935 and October 9, 1935, there was any Union activity, or any dissatisfaction among the employees which was communicated to petitioner, or of which petitioner had knowledge. In fact, the only complaint received by petitioner even remotely bearing upon the instant situation, was that presented by the committee on October 14, heretofore related, and which had to do only with the matter of additional compensation for overtime work. The committee was received, the matter discussed and the committee advised that its request would be denied, with the right, however, to submit the proposals to higher officials. We find nothing which was said or which occurred at that meeting to indicate an unfriendly attitude toward the Union, or a refusal to bargain with it. It is true, there is evidence to show that the employees had grievances other than the one presented, but these were not discussed or made known to the petitioner by the Union or any of its accredited representatives.

■ Certain statements found by the Board to have been made by supervisory officials of petitioner present a more troublesome question. In considering such statements, however, we think we must consider the general attitude of petitioner in respect to the Union. In addition to what we have said, numerous executive officials of petitioner testified that foremen and supervisors had instructions that membership in a Union was not to be considered in hiring men and that there must be no discrimination against the Union. This policy is corroborated by a number of employees whose testimony was to the effect they were advised when employed that the company had no objection to their membership in the Union. For instance, Sherrill (one of the men in question) testified that he was told by Foreman Beckwith, when employed in 1934, that he could use his own judgment about joining the Union and that it was immaterial to the company whether he did or not. To the same effect is the

testimony of Hudson and Fillinger (named in the complaint, but reemployed prior to hearing). Molebash testified that Foreman Beckwith had been in favor of organizing the Union.

We shall not relate the various alleged discriminatory statements made by supervisory officials. We will confine ourselves to stating the most damaging statement relied upon. It was testified by one, Neff, an employee and member of the Union, that upon inquiry as to why the six men had not been reinstated, that Foreman Beckwith replied "They were damned Union agitators." It is argued that this testimony is so unreasonable and preposterous as to be unbelievable. Whatever we might think in this regard, the Board found that the statement was made. It is also argued, that even if made, it could not be binding upon petitioner. In view of petitioner's attitude as heretofore discussed, we think this contention is tenable. We do not mean to hold that such a statement would not be binding upon an employer under some circumstances, but it is our judgment, under the circumstances here existing, that it was made without authority and not binding upon petitioner. National Labor Relations Board v. Sands Mfg. Co., 306 U. S. 332, 341, 59 S.Ct. 508, 83 L.Ed. 682; Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 106 F.2d 100, 114.

There is a great deal of testimony in the record as to the alleged misconduct on the part of the employees in question. Some of it is of a trivial nature and some more serious. Briefly, it consists largely of various acts of insubordination by violating numerous rules and regulations. Many of these acts were not disputed by the men at the hearing. It is sought to justify them largely upon the grounds that no effort was made to enforce such rules and regulations and that, in some cases, they were violated by the foremen themselves. It is apparent that Molebash and Nimroth were the worst offenders and there is convincing testimony to the effect that they called the foreman vile and obscene names and in general had little regard for authority.

McCaw was shown to be an inefficient workman and had on different occasions refused to do certain work assigned him. The Board found with reference to McCaw the same as it did with reference to the other three men in controversy,—that the refusal to reinstate him was due to his Union activities, notwithstanding the fact that the trial examiner had found and reported to the contrary. This finding of the Board is based almost entirely upon the testimony of Superintendent Getzen as to a conversation had with McCaw shortly subsequent to his discharge. Inasmuch as the Board places so much stress on this statement, we set it forth in full in the footnote.[4] Concerning this statement, the Board, in its brief, states: "* * * This admission comports with the Board's findings that McCaw, like the other members of the group, was denied reinstatement, not because he was unsatisfactory as a workman, but because of his union activities." We have read and reread this statement, and we find nothing in it which justifies such a conclusion.

Therefore, we find that the conclusions of the Board that Molebash, Nimroth, Sherrill and McCaw were refused re-employment because of their membership in a labor organization, or their concerted activities for the purpose of collective bargaining, are not supported by substantial evidence. Also, that the acts and statements of the officers and supervisory officials of petitioner were not such as justify a finding they interfered with, restrained or coerced the employees in the exercise of rights guaranteed to them by the Act.

The petition to review is granted, and the petition of the Board for the enforcement of its order of December 13, 1938, is denied. A decree will be entered accordingly.

TREANOR, Circuit Judge (concurring in result).

I concur in the result announced in the majority opinion but do not agree with the

---

4 Well, he came in and I said, "Hello, Pete"—that is his nickname, Pete. And he said, "How is chances for my job," and I says "Well, we haven't any opening, Pete." "Why not?" "Well," I says, "I will tell you. I am awfully surprised at what you did the other night in the face of the fact that we have been carrying you such a long time," and so we had. "We have put up with an awful lot with you, and I was very much surprised you would do a thing like that, and I don't believe we will ever be able to make a polisher out of you, from the report I get from Beckwith, and we have no opening for you."

reasons stated therein. As to the sufficiency of the evidence I am convinced that the testimony of the various witnesses furnishes substantial evidence to support the findings of the Board. In view of the sharp conflicts in the testimony there were serious questions of credibility for the examiner; but the examiner having resolved conflicts in evidence against petitioner, I think that a reviewing court cannot say that there was not substantial evidence within the meaning of that term as defined in numerous decisions of the Supreme Court and of this Court. Indeed petitioner in its brief tacitly admits that the question of credibility of witnesses is the determining factor as respects substantiality of evidence. Under the heading "Credibility of Witnesses" petitioner complains of what petitioner considers the prejudice of the Board as evidenced by its uniform acceptance of the testimony of adverse witnesses and its complete disregarding of all testimony of petitioner's witnesses. Petitioner states in its brief "that on not one controverted issue did the Board ever find that its witnesses were not telling the truth," and petitioner further states that "such a uniform finding certainly makes the entire finding suspicious, as it hardly seems possible that the Board's witnesses could always be right and petitioner's could never be right." The fact that we cannot say that we, if sitting as triers of the facts, would have appraised the testimony of witnesses as the trial examiner appraised it does not justify us, as reviewing judges, in disregarding the findings, if there were witnesses whose testimony furnished substantial evidence to support the findings. Substantiality of evidence and credibility of witnesses present distinct questions, and the question of credibility is exclusively for the trier of facts.

Also I am of the opinion that the employer and employee relation was not destroyed either by the conduct of the employees or by the act of the employer in announcing an indefinite lay-off of the employees. Whether the conduct of the men constituted a strike, or whether the act of the employer amounted to a lock-out the fact remains that the cessation of work was the result of a bona fide labor dispute. The petitioner, however, was justified in treating the action of the men as a voluntary cessation of their work and was within its right in attempting to get other men to take their places. I find nothing in the National Labor Relations Act which requires an employer to shut down his plant when the employees voluntarily quit their jobs, even though they quit as a part of a regularly organized strike. Under the facts of this case the "lay-off" order of petitioner did not constitute an unfair labor practice, and it is not charged that it did; consequently, the employer was not precluded from replacing the men by other individuals. In my opinion the termination of work under the facts of this case constituted a cessation in "consequence of, or in connection with, any current labor dispute" within the terms of Section 2 (3) of the National Labor Relations Act.

The record shows that after the conclusion of the hearing before the examiner, and after the intermediate report had been filed, the Board, without notice to the petitioner, entered the following order: "It Is Hereby Ordered that the aforesaid Metal Polishers International Union, Local 77 be and hereby is granted permission to withdraw its charge and that the complaint herein be and hereby is dismissed without prejudice to the Board's right to reinstate the complaint upon the petition of the aforesaid Metal Polishers International Union, Local 77, for good cause shown, and, with or without further hearing, to take such further proceedings as it may deem warranted."

I am of the opinion that the Board was without power to make the foregoing order. There is no provision in the statute which purports to provide the details of procedure to be followed by the Board in the matter of dismissals and reinstatements, but unquestionably it has the power in that respect which is reasonably necessary to the exercise of its general power to hear and determine issues presented to it. Since there is no time limitation in the statute for reinstatement, the Board no doubt has the power to dismiss without prejudice to its right to reinstate a complaint within a reasonable period of time. No doubt the Board in the instant case could have continued the case for a reasonable length of time even at the stage of the hearing which existed on August 14, 1936. But it does not follow that the Board could authorize the withdrawal of the charges and dismiss the complaint after the hearing before the examiner had been concluded, and retain jurisdiction to reinstate at some

indefinite time in the future for the purpose of taking "such further proceedings as it may deem warranted" and with the condition that such further proceedings should be "with or without further hearing." There are many cases which hold that courts may dismiss pending causes without prejudice to a reinstatement, but I know of no decision which holds that a court may dismiss a case after all the evidence is in and preserve its power to reinstate at some indefinite time in the future for further proceedings on the basis of the evidence which was introduced prior to dismissal.

Undoubtedly the Board had the power to grant the request of the Union "to withdraw the charges without prejudice," that is, without prejudice to the right of the Union to file its charges at a later time. But as I view it the Board was without power to grant the request to withdraw the charges and to dismiss the complaint and yet retain jurisdiction to decide the cause on the basis of the hearing theretofore had. The petition to reinstate was not filed until May 8, 1937, and a supplemental petition was filed December 29, 1937. The petitioner filed objections to the petition for reinstatement and the Board heard argument thereupon on January 25, 1938, and on May 21, 1938, the order of reinstatement was entered. Since I believe that the order of August 14, 1936 was ineffective, I also believe that the order of reinstatement of May 21, 1938 was without legal effect.

Even if the Board had the power to make such an order as was made on August 14, 1936, I think it was an abuse of discretion to reinstate the cause after the expiration of approximately two years over the objection of the petitioner and without providing for a further hearing. This is especially true in view of the fact that the only reason suggested for the attempt to retain jurisdiction for an indefinite period of time was that the decision of the Supreme Court in Carter v. Carter Coal Co. 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160, occasioned some doubts as to the legality of the application of the National Labor Relations Act to the instant case, and although the applicability of the Act was upheld in other decisions of the Supreme Court in April, 1937, the order of reinstatement was not made until May 21, 1938.