In the Matter of NEW YORK STATE LABOR RELATIONS BOARD, Respondent, against UNION CLUB OF THE CITY OF NEW YORK, INC., Appellant.

First Department, December 22, 1944.

*Edward G. Bathon* of counsel (*Charles R. Barrett* with him on the brief; *Regan & Barrett,* attorneys), for appellant.

*William E. Grady, Jr.,* of counsel (*Louis A. Crisano* with him on the brief; *William E. Grady, Jr.,* attorney), for respondent.

CALLAHAN, J. An employer, appealing from an enforcement order granted to the New York State Labor Relations Board, attacks the order and findings of the Board on three grounds: (1) that the findings were contrary to the evidence and to law; (2) that the Board was ousted of jurisdiction by reason of the action of the National War Labor Board in taking cognizance of the labor dispute involved; and (3) that the order for reinstate-

ment of two employees was improper in that their discharge was justified by reason of their insubordinate conduct.

The employer is a social club conducted in the city of New York, employing approximately ninety-two employees. One of the principal activities of the club is to furnish meals to members and their guests at appointed hours. A large percentage of its employees appears to be engaged in this service.

The club received a demand from Hotel and Club Employees' Union, Local 6, American Federation of Labor, that the union be dealt with as representative of the employees. The employer consented to an election which was duly held, and the union was certified as bargaining agent on July 10, 1941. Thereafter and on seven different dates between July 11th and October 27, 1941, conferences were held between agents of the employer and the union. On October 28, 1941, the union filed a charge with the Board that the employer had failed to bargain in good faith. On November 28, 1941, through the intervention of the Board, the parties again conferred for the last time. On November 29, 1941, two employees (Matthew McTeague and Edward Jacobs) were discharged. On December 1, 1941, an additional charge was filed with the Board based on the dismissal of these two employees, alleging that the discharge had been for union activities. These charges were consolidated and a complaint was issued by the Board initiating the proceedings which eventually resulted in the order appealed from.

The decision of the Board contained findings to the effect that the employer had refused to bargain in good faith and had thereby engaged in unfair labor practices. The basis of this finding of lack of good faith was an inference drawn from the evidence to the effect that the employer in conducting its negotiations had displayed a chronic disinclination to meet the issues raised by the employees or to commit itself thereon. Eventually and after negotiations had been terminated, the employer granted, in part, the main demand of the employees by giving a general wage increase, but in doing so it acted unilaterally, neither apprising the union as bargaining agent of the proposed increase, nor affording it any opportunity to bargain as to the extent of the increments.

The employer strenuously denies the charge of bad faith. It seeks to excuse the delay involved by pointing out that the employer was acting through its house committee which was required to report its negotiations to the board of governors. It states that because of this situation and because the negotiations were conducted in the summer time, when members were

absent on their vacations, some delay was necessary, and that it had proceeded to bargain with reasonable dispatch.

We deem that, within the limitations of the power conferred on this court under the statute to review inferences drawn from conflicting evidence, we may not disturb the Board's finding of lack of good faith. In *Matter of Stork Restaurant, Inc.,* v. *Boland* (282 N. Y. 256, at p. 267) the Court of Appeals of this State said: " Where there is conflict in the testimony produced before the Board, where reasonable men might differ as to whether the testimony of one witness should be accepted or the testimony of another witness be rejected, where from the evidence either of two conflicting inferences may be drawn, the duty of weighing the evidence and making the choice rests solely upon the Board. The courts may not weigh the evidence or reject the choice made by the Board where the evidence is conflicting and room for choice exists.   *   *   *."

As to the second contention of the employer on this appeal — that the jurisdiction of the Board was supplanted by action of the National War Labor Board — we note the following facts appearing in an affidavit of the employer's attorney submitted to Special Term in opposition to the motion for an enforcement order. After the Board had rendered its decision on March 26, 1943, the employer on April 6, 1943, was notified that the labor dispute between the parties had been certified to the National War Labor Board by the Secretary of Labor. Hearings were thereafter held before a panel designated by a Regional Board acting as agent for the National War Labor Board, which issued its directive approving the report of the panel, disposing of some, if not all, of the issues submitted to the State Board. The affidavit further states that pursuant to a provision contained in the directive order and on or about September 17, 1943, an agreement in writing was entered into between the employer and Hotel and Club Employees' Union, Local 6, American Federation of Labor, covering all phases of labor relations between the employer and the employees for whom Local 6 had been designated as bargaining agent.

We have no copy of the agreement of September 17, 1943, in the record, although there is a copy of the directive order. We are unable, therefore, to determine whether the agreement covers the entire controversy decided by the State Board. We find nothing in the directive order relating to the matter of reinstatement of the employees McTeague and Jacobs.

Despite the fact that the parties to this controversy had made the agreement of September 17, 1943, the order appealed from

directs the employer to take the following affirmative action: " (a) On request bargain with Hotel and Club Employees Union, Local 6, A. F. of L., as the exclusive representative of all its employees * * * with respect to rates of pay, wages, hours, and other terms and conditions of employment * * *."

It thus appears that the order appealed from directs bargaining with respect to some matters already covered by contract. The purpose of the State Board in securing an order requiring the parties to bargain in face of the contract between them is not clear. The reply of the State Board in this proceeding states: " In the event that respondent [the employer], despite the contract, gives renewed indication in the future of a refusal to accept the bargaining process, the Board may be constrained in the public interest to invoke the provision of the order relating to bargaining in a subsequent contempt proceeding."

If this means that the State Board intends to enforce continued compliance with the National Board's order or the contract made thereunder, or to compel further bargaining when necessary, it would seem likely — at least during the continuance of the war — that the National Board could compel proper action. In any event, conflict of authority should be avoided.

Upon the present record, however, having no sufficient proof of the terms of the contract entered into pursuant to the directive of the War Labor Board, and there being no proof of any present existing conflict with the directive issued by paramount authority, we deem that the order appealed from presents no reversible error in this respect. If it directs an unnecessary step, or if any conflict of authority arises hereafter, this may be considered if, and when, any application is made to punish the employer for contempt for failure to comply with the enforcement order. (See *Matter of N. Y. State Labor Relations Board* v. *Timen*, 264 App. Div. 120.) In the *Timen* case, this court pointed out that the test to be applied when an enforcement order is sought, is whether the Board's order was proper when made. This rule was not intended, of course, to apply to a situation where a paramount public authority had intervened and made an order in the premises that would conflict with the order sought from this court.

There remains for disposition the third claim of error assigned by the employer. This claim asserts that the discharge of McTeague and Jacobs was justified because of their insubordination, and that, therefore, the order for their reinstatement with back pay should be reversed.

The events leading up to the discharge of these two employees may best be described in the language of the trial examiner of the State Board, who, in his intermediate report, summarized such events as follows:

" (c) That the said McTeague and Jacobs, in concert with the other employees of the respondent in the appropriate unit aforesaid, participated in work stoppages, as follows:

Sept. 29, 1941 stoppage    8:00 to 9:00 P.M.
Nov.  1,   "       "        1:30 to 2:00 P.M.
Nov.  8,   "       "        1:15 to 2:00 P.M.
Nov. 22,   "       "        1:25 to 2:00 P.M.
Nov. 25,   "       "        7:30 to 8:30 P.M.
Nov. 26,   "       "        1:15 to 1:45 P.M.
Nov. 28,   "       "        1:00 to 2:00 P.M.
Nov. 29,   " .     "        Stopped work and refused to return to work upon being ordered to do so. * * *

" (e) The work stoppages were not haphazard affairs. The employees stopped work as a group upon a signal from their shop steward. Co-operating with the shop steward were Union delegates, one from each floor of the Club. When signaled by the shop steward the men would leave their stations in the Club and go down to the locker room where they remained until signaled by the steward to return to their stations. In executing these stoppages the men were at all times quiet and orderly. The extent to which the routine of the Club must have been interrupted by the stoppages can be imagined from the fact that about seventy-five employees participated at one time."

The record also discloses that when work stopped on the eight occasions above noted, every activity in the premises, even to the running of the elevators in the building, ceased. On the occasion of one or more of the earlier work stoppages circulars relating the employees' grievances were distributed by the employees to the club members.

It will also be noted from the foregoing summary that the first seven work stoppages occurred during the period between September 29, 1941, and November 28, 1941, when the bargaining conferences were proceeding. Though no accord had been reached on many of the proposals at issue up to November 28, 1941, when the attempted bargaining ceased, the employer had during the period of discussion accepted four of the employees' twenty-three demands. Some demands had been rejected; others were as yet undecided.

The State Board has found that procrastination on the part of the employer during this period evidenced bad faith. However, for reasons which we will hereinafter indicate, we consider that the employer's lack of good faith in bargaining, even though it amounted to an unfair labor practice, did not deprive the employer of the right to discharge McTeague and Jacobs because of their insubordination.

Apparently the employees in conducting the work stoppages were endeavoring to protest against the employer's conduct, and to persuade it to bargain in good faith. They had the right under the law to attempt to attain their ends by calling a strike, or by any other lawful, " concerted activities." The ultimate questions presented to us are whether the employees were engaged in a " lawful " activity in repeatedly stopping work, and whether the refusal of McTeague and Jacobs to resume work when ordered was an act of insubordination warranting the employer in discharging them.

Upon the occasion of the first seven work stoppages the employer had taken no action. It did not deduct anything from the wages of the employees for the time during which they suspended work. During the eighth work stoppage on November 29, 1941, the club manager drew the names of various employees by lot, and directed each employee to return to work as his name was called. Only McTeague and Jacobs, of the large number of employees present, refused to obey. These two men were then discharged for insubordination.

In his intermediate report, the trial examiner of the State Board said, in effect, that the discharge of McTeague and Jacobs for insubordination was no more effective in terminating the employment relation than if the two men had been on a picket line in front of the club on strike. He held that the two men had, in effect " struck ", and had continued in their refusal to work because of their employer's unfair labor practices. Based on these findings, the examiner recommended that the employer, upon application by McTeague and Jacobs, offer them immediate and full reinstatement to their former positions, and that the employer make them whole for any loss of pay they might suffer from the date of any refusal to reinstate after such demand to the date of a subsequent offer of reinstatement, less any sum which the employees might have earned during the period of refusal.

It will thus be seen that the examiner treated the work stoppages as strikes to enforce collective bargaining. The essential difference between the relief usually afforded reinstated

employees who strike, and those who have been discriminately discharged is that an employee on strike is required to apply for reinstatement on the termination of such strike, while those discriminately discharged are under no such obligation. (*National Labor Relations Board* v. *Biles Coleman L. Co.,* 98 F. 2d 18; " Labor Disputes and Collective Bargaining " by Ludwig Teller, Vol. 2, § 318' and supplement thereto.)

It has been pointed out that even though a strike is caused by the employer's unfair labor practices, the National Labor Board in ordering reinstatement does not award back pay during the period of any strike. (*Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 198, footnote 7.)

Although no exception was taken by the union to the findings made by the trial examiner, the State Board in its final decision made findings that McTeague and Jacobs were discharged " to ' discourage membership ' in a labor organization by ' discrimination in regard to   *   *   *   tenure '   *   *   * " and that they had been required " ' as a condition of employment ' to refrain from ' assisting a labor organization ' of their own choosing." Thus the Board found a violation of the provisions of subdivisions 4 and 5 of section 704 of the State Labor Relations Act, although the trial examiner had dismissed all charges of discriminatory practices under those subdivisions. Acting on its finding of discriminatory discharge, the State Board ordered the reinstatement of McTeague and Jacobs with back pay from the date of their discharge, to wit: November 28, 1941, without requiring them to make any application for reinstatement. Thus the State Board, by the nature of the relief it afforded, treated the discharges as discriminatory, and not as if the two men were striking employees.

In referring to temporary work stoppages of the present nature, the United States Circuit Court of Appeals (Seventh Circuit) said in *C. G. Conn, Limited* v. *National Labor Relations Board* (108 F. 2d 390 at p. 397):

" *   *   *   We are unable to accept respondent's argument to the effect that an employee can be on a strike and at work simultaneously. We think he must be on the job subject to the authority and control of the employer, or off the job as a striker, in support of some grievance.   *   *   *.

" Even if it be assumed that there was a labor dispute, within the meaning of 2 (9) the fallacy of this argument to us lies in the fact that the employees did not cease work in consequence of such dispute. Undoubtedly, when petitioner refused to comply with their request, there were two courses open. First, they

could continue work, and negotiate further with the petitioner, or, second, they could strike in protest. They did neither, or perhaps it would be more accurate to say they attempted to do both at the same time. We have observed numerous variations of the recognized legitimate strike, such as the ' sit-down ' and ' slow-down ' strikes. It seems this might be properly designated as a strike on the installment plan."

But whether work stoppages are considered strikes or not is not controlling. We find no evidence, substantial or otherwise, to support the finding of the Board of discrimination and coercion in the discharge of McTeague and Jacobs. It is practically undisputed on the present record that these two employees were discharged because they refused to return to work when ordered. Their membership in, or attempted assistance of, a union apparently played no part in what occurred. All the other employees present and participating in the work stoppages were likewise union members. The services of all of these persons were retained when they returned to work. Thus there could have been no discrimination as to tenure against the two employees discharged.

Under section 706 of the State Labor Relations Act reinstatement of employees with back pay is authorized only when they are discriminated against in violation of section 704, or their work has ceased as the result of unfair labor practice.

In *Matter of Stork Restaurant, Inc.,* v. *Boland* (282 N. Y., *supra,* at pp. 270-271) the Court of Appeals said:

" The New York State Labor Relations Act leaves an employer free to employ or to discharge as he sees fit for good reason or for poor reason or for no reason at all — subject only to one limitation, that he may not ' require an employee or one seeking employment, as a condition of employment, to join any company union or to refrain from forming, or joining or assisting a labor organization of his own choosing.' Nor may an employer ' encourage membership in any company union or discourage membership in any labor organization, by discrimination in regard to hire or tenure or in any term or condition of employment.' A member of a union has under the statute no security of tenure, which the Board may protect, greater than other employees who are not members. The policy of the statute is that employees shall be free to join a union of their choice or, if they prefer, to join no union. The statute confers upon the Board power to prevent discrimination by the employer which interferes with such freedom of his employees. The Board may not command an employer to retain

in his employ a discharged employee who is a member of the union unless it appears that the discharge was influenced by the employee's membership in the union and was calculated to interfere with the freedom of choice guaranteed by the act to all employees. * * *.

" In considering that question we do not ignore the fact that an employer, exercising his right to discharge unsatisfactory employees, has not under the statute the burden of justifying the discharge. The burden of proving a charge against an employer of ' unfair labor practices ' rests upon those making the charge. The evidence to prove the charge may, of course, be circumstantial, but it must be sufficient to permit a reasonable inference of violation, by the employer, of rights guaranteed by the statute. * * *."

Subdivision 3 of section 701 of the State Labor Relations Act defines " employees " as including " * * * any individual whose employment has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice ".

This definition, however, affords no protection to employees who are discharged for unlawful conduct. It was so held by the United States Supreme Court in *Labor Board* v. *Fansteel Corp.* (306 U. S. 240) in passing on the effect to be given to a similar definition of " employee " found in section 2, subdivision (3), of the National Labor Relations Act (U. S. Code, tit. 29, § 152, subd. [3]).

In *Phelps Dodge Corp.* v. *Labor Board* (313 U. S. 177) the same court said that the purpose of the definition of " employee " in section 2, subdivision (3), of the National Labor Relations Act was assignable to the intention of Congress to designate with whom an employer must bargain collectively, or those who are to be deemed employees included within a bargaining unit.

Other provisions of the New York State Labor Relations Act (§§ 703, 706, subd. 5, and § 713) affirm the right of employees to engage in strikes and lawful, concerted activities. All strikes and concerted activities are not protected; only those lawfully conducted.

In *Labor Board* v. *Fansteel Corp.* (*supra*) it was stated that in protecting the right to strike, the National Labor Relations Act contemplated a lawful strike, and that where a strike — even though actuated by unfair labor practices of the employer — was initiated and conducted in lawlessness by the seizure and retention of the employer's property, through a " sit-down "

strike, the strikers who had been discharged because of their lawlessness did not remain employees within the meaning of the Act, and that it was not within the authority of the Board to reinstate them. In the course of its opinion the court said (at pp. 253–254):

" (1) For the unfair labor practices of respondent the Act provided a remedy. * * * The employees had the right to strike but they had no license to commit acts of violence or to seize their employer's plant. * * * To justify such conduct because of the existence of a labor dispute or of an unfair labor practice would be to put a premium on resort to force instead of legal remedies and to subvert the principles of law and order which lie at the foundations of society.

" As respondent's unfair labor practices afforded no excuse for the seizure and holding of its buildings, respondent had its normal rights of redress. Those rights, in their most obvious scope, included the right to discharge the wrongdoers from its employ. * * * .

" (2) In construing the Act in *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 45, 46, we said that it ' does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them '; that the employer ' may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion.' * * * ."

That the absence of violence by striking employees is not the controlling factor in determining whether a concerted activity is lawful was held in *Southern S. S. Co.* v. *Labor Board* (316 U. S. 31). There seamen had staged a strike aboard ship. Their strike was not accompanied by any disorder, but the men had deliberately and persistently disobeyed the lawful commands of their officers that they make the ship ready for departure. The court held that they had been guilty of mutiny in violation of the United States Criminal Code, and that, therefore, their reinstatement by the Board was unwarranted. The court said (pp. 47–48):

" Likewise, the absence of violence was a fortunate feature of the affair, but the flouting of the captain's authority was nevertheless deliberate and complete. * * * . They asserted their right to occupy the quarters and to eat the food which the master was required to furnish them as members of the crew, and yet to refuse to work or to obey his orders.

" * * * Consequently, and despite the initial unfair labor practice which caused the strike, we hold that the reinstatement provisions of the order exceeded the Board's authority to make such requirements ' as will effectuate the policies of the Act.' "

Although in both the *Fansteel Corp.* and *Southern S. S. Co.* cases (*supra*) violations by the employees of penal statutes had occurred, we see no reason why unlawful, concerted activities are to be limited to conduct involving the commission of crime. We deem that other concerted activities may well be unlawful within the meaning of the Act, and that when the Legislature referred to " lawful, concerted activities ", it did not intend that activities which would flout the fundamental obligations and rights lying at the very foundation of the relationship of employer and employee would be countenanced. Basically implied in the relationship of employer and employee is the obligation of the employee to obey the reasonable instructions of the employer so long as he remains at work. The employer retains control of the direction of the work, the right to fix the hours of employment, and to prescribe the method of conducting its business. These implied rights are subject, of course, to restrictions against unfair labor practices, and to the right of employees to strike and to conduct other lawful, concerted activities to protect their interests.

What occurred here did not amount to a strike in the ordinary sense of that term. The employees did not leave the premises of the employer, but remained thereon. They did not choose to abandon their work until their demands were met. Because of the implied obligation on the part of employees to obey the reasonable instructions of the master, while the employment continues, it would seem to us that the conduct of the employees here was not lawful as within the allowable area of economic conflict. If the employees had been content to distribute circular letters explaining their claims, or to take other steps involving no insubordination, such actions might well be lawful, concerted activities.

We do not intend to hold that a single, temporary work stoppage — particularly one induced by unfair labor practices — would necessarily be an unlawful, concerted activity. At least such an act would not justify any discriminatory discharge.

In *National Labor Relations Board* v. *American Mfg. Co.* (106 F. 2d 61, mod. and affd. *sub nom. American Manufacturing Co.* v. *National Labor Relations Board,* 309 U. S. 629) it appears that on a single occasion employees had stood around the employer's premises for two hours while attempting to per-

suade the employer to fix a date for collective bargaining. When the men attempted to return to work the employer singled out fourteen workmen who had been active in union affairs, and discharged them. Clearly the inference was warranted, under such circumstances, that the discharges had involved discrimination for union activities. The courts there approved an order of the National Labor Relations Board directing reinstatement of the fourteen men.

Here there was not a single work stoppage, but a series of persistently repeated stoppages, always occurring during the busy periods of meal hours, when the services of the employees were needed most. There was thus a clear demonstration that the employees were conducting a campaign involving the flouting of authority of the employer, and without striking were remaining on the premises, but refusing to work. There was no discrimination here in the discharge of McTeague and Jacobs because of union activities. Thus the present case is clearly distinguishable from the case last cited.

It is stated on behalf of the State Labor Board that a distinction exists between a strike or work stoppage, which is purely a use of economic pressure to enforce an economic demand, and a strike or stoppage called in protest against existing unfair labor practices. In the first instance, says the Board, the employer may replace the employees who stop work, and not be required to reinstate them. In the second instance, the Board urges, the employer may not discharge the employees, and is bound to reinstate them even though they have been replaced.

It appears to us that this argument has two weaknesses. *First,* it overlooks the difference between a strike and a work stoppage. If the latter activity is indulged in, there is no opportunity for the employer to replace the employee. Furthermore, in the event of a strike, even though following unfair labor practices, the obligation to reinstate and to pay back wages would run only from the ending of the strike. *Secondly,* we think that the reasoning advanced by the State Labor Board attempts to justify one wrongful act by another. The cases cited by the Board do not support the distinction it asserts insofar as any unlawful, concerted activity is concerned. Said authorities recognize that any strike or other concerted activity unlawfully conducted deprives the Board of the right to reinstate those participating in it.

The controlling issue here is whether the activities of these employees are lawful. We are constrained to hold that they were not lawful, though the work stoppages involved no disorder or

criminal conduct. If continued stoppages of this nature were to be permitted without any right to discharge, it would destroy the master's control of his business. If employees were within their rights to stop work as they did here, and refuse to return to their labors, they would be equally within their rights to remain on the master's premises without working for a major part of each day, or they might otherwise conduct themselves so capriciously as to take control of the business from the employer and transfer it to the employees quite as effectively as if they had taken physical possession of the employer's plant and property.

The authorities hold that if the master exercises the right of discharge for reasons other than intimidation or coercion with respect to union activities or other than as part of an unfair labor practice, then the Board is not entitled to disregard the master's lawful exercise of authority, or make it a pretext for interference with the right of discharge. (*Labor Board* v. *Jones & Laughlin*, 301 U. S. 1; *Matter of Stork Restaurant, Inc.*, v. *Boland*, 282 N. Y. 256, *supra*; *Labor Board* v. *Fansteel Corp.*, 306 U. S. 240, *supra*; *Southern S. S. Co.* v. *Labor Board*, 316 U. S. 31, *supra*.)

Here we think that the master acted within its rights, in that McTeague and Jacobs were guilty of acts of insubordination in refusing to obey a direction to return to work.

The order appealed from should be modified by striking therefrom subdivisions (b) and (c) of the second decretal paragraphs thereof relating to the affirmative action directed to be taken by the defendant-appellant, and as so modified, affirmed.

MARTIN, P. J., GLENNON and COHN, JJ., concur.

Order unanimously modified by striking therefrom subdivisions (b) and (c) of the second decretal paragraphs thereof relating to the affirmative action directed to be taken by the defendant-appellant, and as so modified, affirmed. Settle order on notice.